CHARLES JOHNSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10335–79, 11668–80.     Filed June 7, 1982.

*Harry Margolis* and *Robert L. Dunnett,* for the petitioner.
*William E. Bonano* and *Henry E. O'Neill,* for the respondent.

FAY, *Judge*: Respondent determined deficiencies of $34,698, $35,747, and $40,832 in petitioner's Federal income tax for

---

1975, 1976, and 1977, respectively. At issue is whether amounts paid by a professional basketball club with respect to petitioner's services are income to petitioner or to a corporation to which the payments were made.

These cases are consolidated for trial, briefing, and opinion.

### FINDINGS OF FACT

Some facts are stipulated and found accordingly.

Petitioner Charles Johnson was a resident of Oakland, Calif., when he filed his petitions herein.

During the years in issue, Charles Johnson (hereinafter petitioner) was a professional basketball player. He began playing in the National Basketball Association (NBA) in the fall of 1972. On September 14, 1972, he signed an NBA Uniform Player Contract with the San Francisco Warriors (Warriors). That contract obligated him to play basketball for the Warriors for 1 year in return for $17,500. On October 5, 1973, petitioner signed a second NBA Uniform Player Contract with the Warriors. That contract, covering the 1973–74 NBA season, ran for 1 year from September 1, 1973, and provided for $40,000 compensation.

Although petitioner's 1973–74 contract with the Warriors did not expire until the fall of 1974, the actual playing season ended much earlier, and all compensation due petitioner was to be paid by the conclusion of the playing season. An NBA player may be through playing basketball as early as March or as late as late May depending on whether he is involved in the NBA playoffs. However, a player under contract has certain post-playing-season duties such as keeping in good physical condition and doing requested promotional work. Nevertheless, once the playing season is over, a player may "pretty much do anything [he wants] to do." Certain provisions of petitioner's 1973–74 contract with the Warriors carried significance after the playing season. For example, the Warriors could have traded petitioner, and the Warriors had the right to renew the contract for 1 year.

During the summer of 1974 and after the conclusion of the actual 1973–74 playing season, petitioner followed the advice of a friend and contacted Robert L. Dunnett (Dunnett), a California attorney, concerning financial planning. That contact led to petitioner's signing an agreement on August 16,

1974, with Presentaciones Musicales, S.A. (PMSA), a Panamanian corporation. In very general terms, that agreement (hereinafter the PMSA-petitioner agreement) gave PMSA the right to petitioner's services in professional sports for 6 years beginning August 16, 1974, gave PMSA the right to control petitioner's services with respect to professional sports, and obligated PMSA to pay petitioner $1,500 per month.[1] On August 20, 1974, PMSA licensed its rights and obligations under the PMSA-petitioner agreement to EST International Ltd. (EST), a British Virgin Islands limited liability company. Under that licensing arrangement, EST was obligated to pay any expenses and to make the payments to petitioner required under the PMSA-petitioner agreement. EST was to remit to PMSA 95 percent of the "net revenue" collected by EST under the PMSA-petitioner agreement.[2]

Dunnett, representing petitioner, entered into negotiations with the Warriors for a new contract for petitioner's services. The Warriors were adamant about having an NBA Uniform Player Contract signed by the player, and thus rejected a proposed licensing contract between the Warriors and PMSA.

Given the Warriors's insistence on an NBA Uniform Player Contract, petitioner signed such a contract with the Warriors on August 27, 1974. That contract ran for 2 years from September 1, 1974, and covered the 1974–75 and 1975–76 seasons. While the stated compensation for those seasons was $45,000 and $55,000, respectively, the contract was a "make" contract. Thus, under that contract, petitioner became entitled to the full compensation for a season only if he was a team member after the December 2 falling within that season.

Even though the August 27, 1974, NBA Uniform Player Contract provided for compensation payments to begin on November 1, 1974, no regular payments were made under the contract until June 1975.[3] The delay in payments resulted

---

[1]The PMSA-petitioner agreement and later amendments thereto are discussed in more detail *infra*.

[2]Sometime before May 12, 1976, EST changed its name to Interlit (British Virgin Islands) Ltd. We shall continue to refer to EST even though certain payments were made to Interlit, and Interlit was a party to certain agreements.

[3]Certain per diem checks for on-the-road expenses were issued to petitioner during the playing season.

from Dunnett's continuing efforts to have the Warriors in some way recognize the August 16, 1974, PMSA-petitioner agreement.[4] The Warriors refused to sign any contract or agreement with any person or entity other than petitioner. However, they did agree to remit the contract payments to someone other than petitioner, if petitioner legally assigned the payments.

On April 25, 1975, petitioner executed an Assignment of Contract Rights assigning all contract payments to EST. After that assignment, all contract payments were made to EST.[5] Check stubs reflected the payments as being for petitioner's services. Federal and State income taxes, NBA Players Association dues, and fines were withheld from the payments.

After payments to EST were arranged, nothing further developed between petitioner, the Warriors, and either PMSA or EST. On September 15, 1975, petitioner signed an NBA Uniform Player Contract with the Warriors covering the 1975–76 and 1976–77 seasons. Compensation was set at $85,000 and $90,000, respectively.[6] On August 29, 1977, petitioner signed an NBA Uniform Player Contract with the Warriors for the 1977–78, 1978–79, and 1979–80 seasons. Compensation was set at $100,000, $110,000, and $125,000, respectively. Both of those contracts, covering five seasons, were "make" contracts. See p. 884 *supra.*

Sometime after December 16, 1977, petitioner was waived by the Warriors and cleared waivers. On January 24, 1978, he signed an NBA Uniform Player Contract with the Capital Bullets Basketball Club, Inc., t. a. Washington Bullets (Bullets) for 10 days.[7] On January 30, 1978, he signed an NBA Uniform Player Contract with the Bullets covering the remainder of

---

[4]By letter dated Oct. 28, 1974, petitioner instructed the Warriors not to make a salary payment to him.

[5]Further assignments of contract rights were executed by petitioner in favor of EST on Sept. 20, 1975, covering the NBA Uniform Player Contract dated September 1975, and on Sept. 9, 1977, covering the August 1977 NBA Uniform Player Contract. Furthermore, on June 8, 1977, petitioner authorized release of a playoff bonus check to EST.

[6]The Sept. 15, 1975, contract superseded the Aug. 27, 1974, contract with respect to the 1975–76 season.

[7]When petitioner cleared waivers and then signed with the Bullets, the Warriors claimed they could deduct from the payments due from them under their contract with petitioner the amounts paid by the Bullets for the same period. The dispute went to arbitration resulting in a decision against the Warriors. The resulting payment went to EST.

the 1977–78 season and the 1978–79 and 1979–80 seasons. It was a "make" contract with compensation set at $13,104 for the remainder of the 1977–78 season and at $100,000 for each of the two following seasons. On November 16, 1978, the Bullets and petitioner entered into an agreement whereby the January 30, 1978, NBA Uniform Player Contract was adopted, the PMSA-petitioner agreement was acknowledged, and the Bullets agreed to remit all contract payments to EST. All payments with respect to the 1977–78 season went to EST. Petitioner left the Bullets in October 1979.

In summary, all payments due under various NBA Uniform Players Contracts executed on and after August 27, 1974, went to EST. See note 3 *supra*. No payments have been made to EST since petitioner left the Bullets.

The PMSA-petitioner agreement gave PMSA the right to require petitioner to perform services but acknowledged that any regulations of any professional association would control. That agreement provided both that "Basic commercial and economic control of [petitioner's] services is intended to reside in PMSA at all times," and that petitioner "shall not undertake to perform personal athletic services of any kind for the duration of this agreement without the prior written approval of PMSA." Neither PMSA nor EST in any way actively participated in negotiations with the Warriors or in petitioner's playing of basketball. At trial, petitioner acknowledged that no change with respect to his working relationship with the Warriors occurred after the PMSA-petitioner agreement was executed.

As previously noted, the PMSA-petitioner agreement gave PMSA the right to petitioner's services in professional sports for 6 years and obligated PMSA to pay petitioner $1,500 per month. The $1,500 per month was listed as "compensation for initial term [6 years]" and was made payable to petitioner for his life.[8] However, the agreement provided further:

Should JOHNSON [petitioner] fail to perform services under any license arrangement [unless he is incapacitated] to any professional athletic team or related athletic endeavor for any consecutive twenty-four (24) month period, * * * , PMSA may bring this Agreement to an end and shall retain without

---

[8] PMSA was given an option to renew the PMSA-petitioner agreement for 6 more years.

the necessity of making any further payment of any kind to JOHNSON all the rights held by PMSA under this agreement.

Thus, if petitioner, for 24 consecutive months, failed to perform under any athletic license to a professional team, PMSA was relieved of its obligation to pay petitioner.

The PMSA-petitioner agreement was amended by a letter dated September 16, 1976. Two basic changes were made—the payment to petitioner was increased to $2,000 per month,[9] and a previously initiated loan program, discussed in more detail, *infra*, was approved. A second amendment was executed on December 16, 1977. While that amendment concentrated on the loan arrangement, it also operated as an exercise of PMSA's option to extend the original agreement for 6 years since petitioner's "current agreement with PMSA * * * terminates on August 15, 1980."

In December 1974, PMSA loaned petitioner $10,000 interest free so petitioner could invest in a partnership. Petitioner later sold his partnership interest and repaid the $10,000 in December 1975. After the end of the 1974–75 playing season, petitioner wanted to buy a house, and PMSA agreed to loan petitioner $74,000 interest free with payment due on October 1, 1980. The $74,000 was disbursed to petitioner in $750 monthly increments beginning in September 1975, and one $32,000 advance in November 1975. Those loans were made part of the original PMSA-petitioner agreement by the September 16, 1976, amendment.[10] The December 16, 1977, amendment increased the loan commitment from PMSA to petitioner to $250,000 and required petitioner to give security for past and present loans.

On September 29, 1980, an agreement (hereinafter the Associated Advisors agreement) was executed by and between

[9]The original PMSA-petitioner agreement required cost-of-living increases in the monthly payments to petitioner. However, no such increases were made between August 1974 and September 1976. By the September 1976 agreement, petitioner agreed to an increase to $2,000 per month in lieu of the cost-of-living increases and agreed to no further increases until August 1978. At the time of trial, the $2,000 per month amount was still in effect.

[10]On July 1, 1975, petitioner purchased a house in Oakland, Calif., for $98,000 with financing by Great Western Savings & Loan Association in Oakland. As of June 15, 1976, only $62,000 remained to be paid. By early 1979, the entire balance due had been paid. On Apr. 12, 1979, petitioner executed a deed of trust on his house in favor of PMSA, to secure the loans pursuant to the Dec. 16, 1977, amendment. The trustor was Seabright Land Corp., and its president was Kenneth Reisserer who practiced in the same office as Dunnett.

PMSA, EST, petitioner, and Associated Advisors, a California corporation. Associated Advisors had been formed several years before by Dunnett and lawyers with whom he practiced. The Associated Advisors agreement recalled the PMSA-petitioner agreement and the 1976 and 1977 amendments thereto and provided:

> Under the terms and conditions of [those] agreements, PMSA (or its assignee) is presently obligated to pay certain compensation to Johnson [petitioner] of at least Two Thousand Dollars ($2,000.00) per month to and through December, 1983.

Pursuant to the Associated Advisors agreement, Associated Advisors assumed that liability of PMSA and EST, and acquired all of PMSA and EST's liabilities and rights under the previous agreements and amendments.

The Associated Advisors agreement noted that petitioner owed PMSA $226,500 which was due by October 1, 1980. Associated Advisors agreed to loan petitioner $226,500, at 10-percent interest, to repay PMSA, and petitioner agreed to execute a deed of trust in favor of Associated Advisors. The loan from Associated Advisors was on the following terms: (1) If petitioner's services were licensed for "at least one (1) year before October 1, 1981," the loan would accrue interest until 12 consecutive unlicensed months had passed and would then be fully amortized over 5 years and payable in monthly increments or, (2) if petitioner's services were not licensed "for a period of at least one (1) year before October 1, 1981," the entire loan would be payable on October 1, 1981. Both at the time the Associated Advisors agreement was executed and at the time of trial in August 1981, petitioner's services were not licensed.

As to the monthly payments due petitioner under the PMSA-petitioner agreement and amendments thereto, the Associated Advisors agreement provided:

> Advisors and Johnson [petitioner] agree that the compensation payments to Johnson * * * shall cease as of October 1, 1981, if Johnson's services have not been licensed for a period of at least one (1) year. If, on or before October 1, 1981, Johnson's services are licensed for one (1) year or more, Advisors shall pay to Johnson all compensation due to Johnson under the agreements.

Thus, the length of time petitioner received his monthly payments depended on whether his services were licensed by October 1, 1981.

On his Federal income tax returns for 1975, 1976, and 1977, petitioner reported no wages or salary, but did report the payments he received from EST as business income. He attached to those returns Forms W–2 issued by the Warriors with respect to his services. Petitioner received refunds of Federal income taxes with respect to 1975, 1976, and 1977. Those refund checks, as well as checks representing refunds of State income taxes, were specially endorsed by petitioner to EST. See note 2 *supra*. By a statement attached to an application for an extension to file for 1975, petitioner disclosed his reporting position with respect to personal service income.

In his statutory notices of deficiency, respondent determined all amounts paid by the Warriors in 1975, 1976, and 1977 with respect to petitioner's services were income to petitioner. Thus, he increased petitioner's income by $60,894, $67,060, and $70,327 for 1975, 1976, and 1977, respectively. These increases reflect the excess of the amounts paid by the Warriors with respect to petitioner's services over the amount paid petitioner by EST with respect to those services.

## OPINION

At issue is whether amounts paid by the Warriors with respect to petitioner's services as a basketball player are income to petitioner or to the corporation to which the amounts were remitted. Respondent, relying on the rule of *Lucas v. Earl*, 281 U.S. 111 (1930), that income must be taxed to its earner, contends petitioner was the true earner. Petitioner maintains this is a "loan-out" case like *Fox v. Commissioner*, 37 B.T.A. 271 (1938), and that *Lucas v. Earl* is inapplicable.[11]

---

[11]Petitioner makes no contention, given the payments required to be made to him by EST, that his contractual rights with the Warriors were sold. The parties debate this case solely on the "who" aspect of the assignment of income doctrine, and make no arguments concerning the "when" aspect of that doctrine. See generally *Estate of Stranahan v. Commissioner*, 472 F.2d 867 (6th Cir. 1973), revg. and remanding a Memorandum Opinion of this Court; *Martin v. Commissioner*, 56 T.C. 1255 (1971), affd. without published opinion (5th Cir., Aug. 18, 1972). Thus, we do not decide whether petitioner received adequate consideration in his dealings with PMSA and EST. However, we note there is confusion as to the duration of the monthly payments from EST to petitioner, and petitioner has offered no clarifying evidence. See Rule 142(a), Tax Court Rules of Practice and Procedure.

We find *Lucas v. Earl* indistinguishable in any meaningful sense and hold for respondent.[12]

In *Lucas v. Earl*, the taxpayer executed an agreement with his wife that any property acquired by either of them, including wages and salary, would be considered joint property. The U.S. Supreme Court accepted the validity of that contract, but held the taxpayer earned the salary in issue therein and must be taxed on it. In so holding, the Court noted:

It [the case] turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute [sec. 61] before us * * * [281 U.S. at 114–115.]

From that quote is derived the oft-cited "first principle of income taxation: That income must be taxed to him who earns it." *Commissioner v. Culbertson*, 337 U.S. 733, 739–740 (1949). See also *United States v. Basye*, 410 U.S. 441, 449 (1973).

However, the realities of the business world prevent an overly simplistic application of the *Lucas v. Earl* rule whereby the true earner may be identified by merely pointing to the one actually turning the spade or dribbling the ball. Recognition must be given to corporations as taxable entities which, to a great extent, rely upon the personal services of their employees to produce corporate income. When a corporate employee performs labors which give rise to income, it solves little merely to identify the actual laborer. Thus, a tension has evolved between the basic tenets of *Lucas v. Earl* and recognition of the nature of the corporate business form.[13]

---

[12]Given our holding, we need not address respondent's alternate contention that the arrangement between petitioner and the various entities, other than the Warriors, was a sham. Nor do we address petitioner's argument, based on *Cole v. Commissioner*, T.C. Memo. 1973–74, that collateral estoppel requires us to recognize PMSA as an independent viable corporation. However, for the purpose of reaching our specific holding herein, we accept petitioner's characterization of PMSA.

[13]That tension is most acute when a corporation operates a personal service business and has as its sole or principal employee its sole or principal shareholder. In those cases where sec. 482 applies, resort to general sec. 61 principles usually is not necessary since sec. 482 provides a smoother route to the same "who is taxed" result. See *Pacella v. Commissioner*, 78 T.C. 604 (1982); *Keller v. Commissioner*, 77 T.C. 1014 (1981), appeal filed (10th Cir., Apr. 2, 1982). However, see *Rubin v. Commissioner*, 51 T.C. 251 (1968), revd. and remanded 429 F.2d

While the generally accepted test for resolving the "who is taxed" tension is who actually earns the income, that test may easily become sheer sophistry when the "who" choices are a corporation or its employee. Whether a one-person professional service corporation or a multi-faceted corporation is presented, there are many cases in which, in a practical sense, the key employee is responsible for the influx of moneys. Nor may a workable test be couched in terms of for whose services the payor of the income intends to pay. In numerous instances, a corporation is hired solely in order to obtain the services of a specific corporate employee.[14]

Given the inherent impossibility of logical application of a per se actual earner test, a more refined inquiry has arisen in the form of who controls the earning of the income. See *Vercio v. Commissioner*, 73 T.C. 1246, 1254–1255 (1980). An examination of the case law from *Lucas v. Earl* hence reveals two necessary elements before the corporation, rather than its service-performer employee, may be considered the controller of the income.[15] First, the service-performer employee must be just that—an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. See *Vnuk v. Commissioner*, 621 F.2d 1318, 1320–1321 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; *Vercio v. Commissioner, supra*. Second, there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. See *Pacella v. Commissioner*, 78 T.C. 604 (1982); *Keller v. Commissioner*, 77 T.C. 1014, appeal filed (10th Cir., Apr. 2, 1982).[16]

In the case before us, we accept arguendo that the PMSA-petitioner agreement was a valid contract which required the

650 (2d Cir. 1970), decided on remand 56 T.C. 1155 (1971), affd. per curiam 460 F.2d 1216 (2d Cir. 1972), wherein application of secs. 61 and 482 led to different results. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954 as amended.

[14]Such instances are commonplace in personal service businesses such as law, medicine, accounting, and entertainment. See, e.g., *Cole v. Commissioner, supra* note 12.

[15]Although some of the cited cases deal with trusts rather than with corporations, their discussions of general sec. 61 principles apply to both entities. See sec. 1.671–1(c), Income Tax Regs. We couch our discussion herein in terms of corporations simply because it comports with the facts before us.

[16]See also *Foglesong v. Commissioner*, T.C. Memo. 1976–294, revd. and remanded 621 F.2d 865 (7th Cir. 1980), decided on remand under sec. 482, 77 T.C. 1102 (1981), appeal filed (7th Cir., Feb. 16, 1982).

payments with respect to petitioner's performance as a basket-ball player ultimately to be made to PMSA or EST. See note 12 *supra*. We also accept arguendo that the PMSA-petitioner agreement gave PMSA a right of control over petitioner's services, although respondent maintains the agreement's control provisions systematically were ignored. See pp. 886-887 *supra*. Thus, the first element is satisfied. However, the second element is lacking, and that is what brings this case within *Lucas v. Earl* rather than the cases relied on by petitioner.

In *Fox v. Commissioner*, 37 B.T.A. 271 (1938), the taxpayer was a cartoonist who formed a corporation. He transferred to the corporation cash and property and assigned to the corporation copyrights and his exclusive services for a number of years. The corporation executed a contract with a syndicate giving the syndicate the right to use the taxpayer's cartoons in return for a percentage of gross sales. The amount the corporation thus received greatly exceeded the amount the corporation paid the taxpayer for his services. The Court held the excess amounts were not the taxpayer's income. *Lucas v. Earl* was inapplicable because the employment relationships existed between the corporation and the syndicate and between the corporation and the taxpayer and not between the taxpayer and the syndicate.[17]

In *Laughton v. Commissioner*, 40 B.T.A. 101 (1939),[18] the taxpayer, an actor, formed a corporation. He contracted with the corporation to receive a weekly payment and certain expense payments in return for his exclusive services. The corporation executed contracts with two film studios whereby the taxpayer's services were loaned to the film studios.[19] The Court held the taxpayer was not taxable on the amounts paid

---

[17]Petitioner also relies on the Second Circuit Court of Appeals reversal in *Rubin v. Commissioner*, note 13 *supra*. However, as we understand the Court of Appeals' opinion, it merely mandated preferential application of sec. 482. Nevertheless, in *Rubin*, there existed a contract between the taxpayer's corporation and the entity benefiting from the taxpayer's services.

[18]*Laughton v. Commissioner*, 40 B.T.A. 101 (1939), was remanded by the Ninth Circuit Court of Appeals, 113 F.2d 103 (9th Cir. 1940), solely for consideration of the effect, if any, which *Higgins v. Smith*, 308 U.S. 473 (1940), had upon respondent's argument that the corporation was the taxpayer's agent or alter ego.

[19]Certain contracts executed by the taxpayer prior to formation of the corporation were assigned to the corporation.

to the corporation by the studios because those amounts were paid "under contracts between it [the corporation] and the studios" and there simply was no assignment of income by the taxpayer. See *Laughton v. Commissioner, supra* at 106–107.

Petitioner herein stands upon vastly different ground than did the taxpayers in *Fox* and *Laughton*. While petitioner had a contract with PMSA, and by assignment, EST, he also had an employment contract with the Warriors. Crucial is the fact that there was no contract or agreement between the Warriors and PMSA or EST. Nor can any oral contract between those entities be implied. See *Pacella v. Commissioner, supra.* The Warriors adamantly refused to sign any contract or agreement with any person or entity other than petitioner.[20] Thus, the existing employment relationships were between petitioner and PMSA/EST and between petitioner and the Warriors. The relationship between PMSA/EST and the Warriors necessary for PMSA/EST to be considered actually in control of the earnings was not present. As with Mr. Earl, petitioner "was the only party to the contracts by which the salary * * * [was] earned." See *Lucas v. Earl*, 281 U.S. 111, 114 (1930).[21]

Nor may the assignments of earnings executed by petitioner suffice to make PMSA/EST the taxable party. Such assignments merely demonstrate petitioner's control over the earnings such as would an ordinary assignment of wages to a bank. Nor is it important that petitioner contractually was obligated to pay his earnings to PMSA/EST. The U.S. Supreme Court in *Lucas v. Earl* accepted the validity of the contract involved therein requiring transmission of one-half to Mrs. Earl, but nevertheless held Mr. Earl taxable as the true earner.

In summary, we find petitioner, rather than PMSA or EST, actually controlled the earning of the amounts paid by the

---

[20]The reasons for the Warriors's refusal to so contract is not particularly relevant. However, many of the Warriors's concerns may perhaps be unique to professional sports. But, petitioner was not in a position where his goal of assured future income was unobtainable solely due to his choice of professions. Deferred compensation arrangements are common in professional sports, and many are accepted for tax purposes. See J. Weistart & C. Lowell, The Law of Sports sec. 7.06 (1979).

[21]We do not mean to imply this case necessarily would have been decided in petitioner's favor had a contract been executed between the Warriors and PMSA or EST. See note 12 *supra.*

894

Warriors with respect to petitioner's services. Thus, those amounts were income to petitioner under section 61(a)(1).[22]

To reflect the foregoing,

*Decisions will be entered for the respondent.*

---

[22]Petitioner, relying on *Weimerskirch v. Commissioner,* 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), maintains respondent's actions with respect to him were arbitrary and capricious, and the burden of proof should have shifted. *Weimerskirch* has no applicability herein. Our decision herein is not based on any presumption of correctness attaching to respondent's notice of deficiency or, to any great extent, upon the burden of proof. See generally *Karme v. Commissioner,* 73 T.C. 1163 (1980), affd. 673 F.2d 1072 (9th Cir. 1982). Indeed, we basically have accepted petitioner's version of the facts.