RICHARD V. KANEHL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kanehl v. Commissioner
Docket No. 5285-87
United States Tax Court
T.C. Memo 1989-322; 1989 Tax Ct. Memo LEXIS 322; 57 T.C.M. (CCH) 854; T.C.M. (RIA) 89322; July 5, 1989
*322 Held: Petitioner, rather than corporation in which he was a shareholder, is taxable on consulting fees. Robert H. Hishon and Dan R. Musick, for the petitioner. Linda J. Wise, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By statutory notice dated November 24, 1986, respondent determined a deficiency in petitioner's 1980 Federal income tax in the amount of $ 15,280. Respondent also determined that petitioner was liable for an addition to tax pursuant to section 6653(a)[1] in the amount of $ 764. The sole issue is whether certain consulting fees are taxable to petitioner or to Mary Howard Foods, Inc., a corporation in which petitioner was a shareholder. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation, supplemental stipulation, and attached exhibits are incorporated by this reference. Petitioner was a resident of Atlanta, Georgia, at *323 the time he filed his petition. For several years prior to May 1978 petitioner was president and principal shareholder of Dri-Mix Products Corporation (Dri-Mix) in Mobile, Alabama. Dri-Mix was in the business of, among other things, the preparation for and sale of combat rations to the Defense Department, and had received a contract for the assembly of 36,000,000 such meals. Each so called C-ration consisted of 40 components, of which all but three were supplied by the Defense Department. After Dri-Mix off-loaded 900 rail cars and 100 percent of some of the components, some of the pork and beans components, which were procured from a third party, were found to be contaminated with botulism. This contamination caused the Defense Department to postpone delivery of this and other C-ration components until the cause of the contamination could be ascertained. Although it was later learned that the contamination was in the Defense Department laboratory rather than in the pork and beans, the delay of several months ultimately caused the demise of Dri-Mix. This demise was hastened by the spoilage of certain other C-ration components caused by a leak in the roof of a warehouse that *324 Dri-Mix leased from Teledyne Continental Motors (Teledyne), who was responsible for its maintenance. On February 21, 1979, Dri-Mix filed a petition pursuant to Chapter XI of the Bankruptcy Act. Dri-Mix continued operations as debtor in possession until May 1, 1979, when the case was converted to a liquidation proceeding and a trustee appointed. Prior to its bankruptcy, Dri-Mix maintained extensive banking relations with Merchants National Bank of Mobile (Merchants Bank). At the time it began its liquidation proceedings, Dri-Mix was heavily indebted to Merchants Bank. Dri-Mix considered that it had valid and valuable claims against the Defense Department and Teledyne. These claims were held jointly with, or assigned to, Merchants Bank as Dri-Mix's principal debtor. However, since Dri-Mix was in liquidation, the trustee in bankruptcy considered that the estate owned the claims. Merchants Bank and the trustee eventually decided to jointly pursue those claims, because of the former's financial ability to do so. However, they needed petitioner's assistance to enhance their prospects of recovery. For approximately 1 year after Dri-Mix filed its bankruptcy petition, petitioner *325 worked with Merchants Bank, without compensation, pursuing the claim against the Defense Department. By letter dated January 16, 1979, petitioner's attorney expressed to counsel for Merchants Bank petitioner's intention to accept an offer of employment on the west coast unless he were established in business in the Mobile area with Merchants Bank's assistance. While petitioner was no longer in a position to make himself continually available to assist in preparing claims against the Defense Department and Teledyne, he felt an obligation to Dri-Mix's creditors in general and Merchants Bank in particular. In the period after Dri-Mix filed for bankruptcy, petitioner was a shareholder and employee of a corporation known as Quality for Less Foods (Quality for Less). However, petitioner could not realize his employment goals through that company, since Quality for Less, which had assumed all of Dri-Mix's non-Governmental contracts, was indebted to Dri-Mix and threatened by possible litigation to be instituted by Dri-Mix's bankruptcy trustee. Petitioner and Quality for Less' other shareholders sought to create a new business along the same lines so that petitioner might have suitable *326 employment with adequate compensation while still making himself available to Merchants Bank to pursue its claims. The January 16, 1979, letter from petitioner's attorney proposed as follows: Those of the stockholders, so involved, would propose to organize a new corporation which would then submit formal offer to the estate of Dri-Mix Products Corporation to purchase all of the Trustee's right, title and interest in and to any and all claims against Quality for Less including the promissory note to Dri-Mix for $ 30,000 cash. Such payment would also be in consideration for the execution by the estate of a complete and general release to [petitioner] and to any and all stockholders of Quality for Less Foods, Inc.
The stockholders would propose to have the Bank advance sufficient funds to the new corporation so as to allow the $ 30,000 payment as proposed to the estate and to allow a sufficient amount of working capital to allow the company to expand its operation * * *. The borrowing corporation would endeavor to enter into an agreement with the Bank, documenting this loan transaction, and agreeing to repay the indebtedness over a reasonable period of time while giving the *327 Merchants National Bank a first lien security interest in all assets of the new corporation. The new corporation, which proposes to enter into an employment agreement with [petitioner], would agree to make [petitioner] available to the Bank for its use in preparing and pursuing its claim against the U.S. Government in return for the Bank's compensating the corporation for all actual out-of-pocket expense incurred by [petitioner] or the new company in the preparation. On June 4, 1979, Merchants Bank entered into a consulting contract with petitioner in his individual capacity whereby petitioner was to "render to the Bank services as a consultant to assist in connection with furnishing, assembling and analyzing information required by attorneys designated by the Bank to be presented in support of claims against the U.S. Government * * *." [2] Petitioner was to act as an independent contractor and was not to be considered an agent or employee of Merchants Bank. Petitioner agreed to make himself available for any judicial or administrative proceeding, although he was not required to devote a particular amount of time to the pursuit of those claims, nor was he required to refrain *328 from any business activity which did not conflict or interfere with his consulting services. The term of the contract was 1 year, with Merchants Bank retaining the option to extend the contract for not more than two consecutive 6-month periods. Petitioner was to be paid $ 8,833.33 the first month and $ 4,015.15 per month thereafter, plus expenses. Should Merchants Bank exercise its option to extend the contract, petitioner's compensation would be reduced to $ 3,000 per month. During 1979, petitioner was paid a total of $ 33,923, which he reported on his Federal income tax return for that year. Also on June 4, 1979, Merchants Bank provided petitioner with a loan commitment for the new entity to be called Mary Howard Foods, Inc. (Mary Howard), in an amount not to exceed $ 70,000, subject to certain conditions. On September 10, 1979, Mary Howard was incorporated under the laws of the State of Alabama "To engage in the business of packaging dry food mixes and foodstuffs." Mary Howard's incorporators and original officers and directors were three individuals unrelated to petitioner, *329 and were acting in their capacities as officers and directors solely as nominees for petitioner and his wife. At Mary Howard's first shareholders' meeting, the three incorporators resigned their positions as officers and directors. Petitioner's wife succeeded to 98 percent of Mary Howard's stock and was elected secretary-treasurer and made a member of Mary Howard's board of directors. Petitioner was elected president and was also placed on the board of directors. While petitioner succeeded to only 2 percent [3] of Mary Howard's stock, he was the driving force behind Mary Howard's operations. On January 4, 1980, a special meeting of Mary Howard's board of directors was held, at which petitioner and his wife were present and constituted a quorum. At this meeting, it was resolved that Mary Howard was to compensate petitioner in the amount of $ 40,000 per year. It was also resolved that an agreement would be approved with Merchants Bank to compensate Mary *330 Howard for the services of petitioner which were lost because of the time petitioner spent assisting in the pursuit of the claim against the Defense Department. No written agreement concerning petitioner's consulting services was ever executed between Merchants Bank and Mary Howard, and petitioner never assigned his rights and obligations under the June 4, 1979, contract to Mary Howard. However, on June 24, 1980, petitioner and Merchants Bank executed an agreement extending the June 4, 1979, contract through December 4, 1980. With the exception of petitioner's reduced compensation, all the terms and conditions of the earlier contract remained in effect, and Merchants Bank continued to pay petitioner individually for his consulting services rather than pay Mary Howard. During all of 1980, Merchants Bank issued checks to petitioner in the total amount of $ 41,076.50. For 1980, Merchants Bank issued a Form 1099-NEC to petitioner in like amount. However, on the advice of his accountant, petitioner did not report this amount on his individual income tax return; rather, Mary Howard reported income from consulting fees in the amount of $ 46,150 on its corporate return for its fiscal *331 year ending August 31, 1980. Mary Howard accrued on its books and took a deduction for petitioner's salary for that year in the amount of $ 40,000, although petitioner's salary remained unpaid because of a cash shortage. [4] Petitioner, a cash-basis taxpayer, did not report any income from Mary Howard. By the time the extension executed June 24, 1980, expired, Merchants Bank no longer required petitioner's services on a regular basis. However, in a letter dated December 30, 1980, from petitioner's attorney to Merchants Bank, petitioner offered his services on an "as needed, when needed" basis for $ 250 per day plus expenses. Merchants Bank responded to this offer on January 22, 1981, accepting petitioner's offer on those terms. Neither the letter from petitioner's attorney nor Merchants Bank's response mentioned Mary Howard as the actual or nominal provider of consulting services. On April 21, 1981, counsel *332 for Merchants Bank sent a letter to petitioner, in care of Mary Howard, which stated: Enclosed please find our firm check for $ 250.00 which sum represents payment in full of your per diem charge for February 18, 1981, as agreed with the Bank along the lines suggested in a letter from your attorney * * * to the Bank's Anthony F. Patrick on December 30, 1980. We are making this payment to Mary Howard Foods, Inc., as directed by you in order to prevent your having to turn around and endorse the check over to your said employer, which procedure you have advised was necessitated in the past. During 1980, petitioner maintained a personal checking account at the American National Bank and Trust Company of Mobile. Petitioner made deposits into this account in the amount of $ 4,015 each in the months of January, February, April, and May 1980. He made deposits of $ 3,000 each during the months of June, July, and August 1980, and two deposits in that amount in September 1980. These deposits were all checks made payable to petitioner by Merchants Bank and were in payment for his consulting services with respect to the claim against the Defense Department. Petitioner paid some of Mary *333 Howard's expenses as well as personal expenses out of this account. Mary Howard maintained three checking accounts, one at Merchants Bank and two at Citizens and Southern Emory Bank (Citizens Bank) in Chamblee, Georgia. Petitioner was authorized to withdraw funds from all of these accounts. Petitioner deposited the payment for his consulting services for March 1980 into one of Mary Howard's checking accounts at Citizens Bank. At the close of its fiscal year ending August 31, 1980, Mary Howard's balance sheet showed cash on hand in the amount of $ 75,704.77. A portion of this balance represented the proceeds of a loan from the Small Business Administration (SBA) in the amount of $ 85,000. The proceeds of this loan were to be used to repair certain equipment which Mary Howard had purchased from Quality for Less which the latter had obtained as part of a compromise of adversary proceedings in Dri-Mix's bankruptcy case. These repairs were necessary because of damage done to that equipment by Hurricane Frederick, which struck the Mobile area shortly after Mary Howard's incorporation. Of the SBA loan proceeds, $ 73,500 was deposited in Mary Howard's savings account at Citizens Bank. *334 The remainder of those funds was used to transport the equipment to Atlanta for repair and eventual installation, as Mary Howard moved its business to Atlanta during 1980. During Mary Howard's relocation, petitioner temporarily resided in an apartment in Atlanta which was paid for by Mary Howard. Mary Howard's business was subcontracted to a company called IPK until Mary Howard commenced operations in Atlanta. OPINION Initially, the parties on brief ask for rulings on certain evidentiary matters. Those rulings have been made by separate order. Respondent's primary basis for attributing to petitioner consulting fees paid by Merchants Bank is the proposition, first expressed in Lucas v. Earl, 281 U.S. 111 (1930), that income must be taxed to its true earner. However, that test "may easily become sheer sophistry when the 'who' choices are a corporation or its employee. * * * In numerous instances, a corporation is hired solely in order to obtain the services of a specific corporate employee." Johnson v. Commissioner, 78 T.C. 882, 891 (1982), affd. *335 without published opinion 734 F.2d 20 (9th Cir. 1984). In cases involving the application of both the true earner test of Lucas v. Earl, supra, and the separate corporate existence doctrine of Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), it is insufficient merely to identify "the one actually turning the spade or dribbling the ball." Johnson v. Commissioner, supra at 890. In such cases we have developed a two-prong test: First, the service-performer employee must be just that -- an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. Second, there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. Haag v. Commissioner, 88 T.C. 604, 611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); Johnson v. Commissioner, supra at 891. [5] Regardless or whether petitioner was an employee of Mary Howard, we find that the second prong of this test is not satisfied, *336 as there was no contract between Merchants Bank and Mary Howard for petitioner's services. We therefore find for respondent on this issue. On June 4, 1979, petitioner entered into a contract with Merchants Bank in his individual capacity whereby he would perform consulting services with respect to Merchants Bank's claim against the Defense Department. Citing the January 16, 1979, letter to Merchants Bank from petitioner's counsel, petitioner argues that prior to the execution of that contract, it was contemplated that Mary Howard would be substituted for petitioner after it came into existence and began doing business. In further support of his position, *337 petitioner points to the minutes of a meeting of Mary Howard's board of directors dated January 4, 1980, wherein the board resolved to approve an agreement with Merchants Bank with respect to compensation for petitioner's lost services. However, petitioner has produced no evidence that Merchants Bank recognized the existence of a contract between itself and Mary Howard for petitioner's services. Indeed, the evidence is to the contrary. While the letter to Merchants Bank from petitioner's counsel contemplated some form of agreement with Mary Howard upon its formation, petitioner contracted with the Bank individually after the letter was sent. Petitioner argues that this contract was orally modified after Mary Howard came into existence. However, there is nothing in this record to indicate that the contract was assigned from petitioner to Mary Howard, or that Mary Howard was substituted for petitioner by way of novation. To the contrary, Merchants Bank exercised the option granted by its June 4, 1979, contract with petitioner and extended the consulting contract through the end of the year before the Court. Merchants Bank's exercise of that option is indicative of the fact that *338 it considered the initial contract with petitioner individually to have remained in effect and unmodified from June 1979 through June 1980. While Merchants Bank may not have been opposed to doing business with Mary Howard so long as petitioner's services were available, there is nothing in the record to indicate that there was ever any contract or other agreement, whether oral or written, expressed or implied, between Merchants Bank and Mary Howard with respect to petitioner's services. Moreover, we are not convinced that the letter of January 16, 1979, evidences an intent on the part of either petitioner or Merchants Bank that the latter should someday enter into a contract for petitioner's services with Mary Howard. Through the date on which that letter was written, petitioner had provided his services with respect to Merchants Bank's claims against the Department of Defense without compensation. The letter did not contemplate compensation as such for either petitioner or Mary Howard; rather petitioner's services were provided in exchange for out-of-pocket expenses. No more appears from that letter than that petitioner's continued availability was the quid pro quo for Merchants *339 Bank's loan commitment to the yet-to-be-formed Mary Howard Foods. Petitioner argues that the contract between himself and Merchants Bank was never formally modified to substitute Mary Howard as the service provider because other events occurring during this period demanded his time and attention. These demands, which were primarily the result of damage inflicted by Hurricane Frederick and Mary Howard's decision to move its operations to Atlanta, do not however alter the tax consequences of events as they actually occurred. "[A] transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred." Frank Lyon Co v. United States, 435 U.S. 561, 576 (1978). Further, the only evidence of an informal modification of the contract is petitioner's own testimony. We draw an adverse inference from petitioner's failure to call as a witness any employee or officer of Merchants Bank to corroborate petitioner's claim of an informal modification. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), *340 affd. 162 F.2d 513 (10th Cir. 1947). All of the objective evidence points to the fact that Merchants Bank contracted only with petitioner and at all times considered itself as doing business with petitioner individually. The fact that the extension of the consulting contract executed in June 1980 was between Merchants Bank and petitioner individually leads to this conclusion. Had any informal modification to the original consulting contract been made prior to the June 1980 extension, it surely would have been made formal at that time. Subsequent correspondence between petitioner, through his attorney, and Merchants Bank is further evidence that petitioner was the contracting party. Petitioner's offer of December 30, 1980, to make himself available on an "as needed, when needed" basis makes no mention of Mary Howard, nor does Merchants Bank's January 22, 1981, acceptance of that offer. Petitioner points to the April 21, 1981, letter from counsel for Merchants Bank as evidence that the original contract had been informally modified. The per diem payment accompanying that letter was made to Mary Howard "as directed by [petitioner] in order to prevent [his] having *341 to turn around and endorse the check over to [Mary Howard], which procedure you have advised was necessitated in the past." The letter does not state that the payment was made to Mary Howard as the service provider. Rather, the letter implies that payments were made to petitioner from June 1979 until that time, a fact confirmed by petitioner's own testimony. [6] Surely any informal modification would have been memorialized by that time. Petitioner points to the fact that although the checks were made payable to him individually and were deposited in his personal checking account, certain corporate expenses were paid from that account. The payment of corporate expenses is irrelevant to the question of whether there was a contract for consulting services between Merchants Bank and Mary Howard. Rather, such payment represents a contribution *342 to capital by petitioner. Finally, petitioner argues that respondent overstated the income received pursuant to the consulting contract, as some of it was received in 1979. The parties' stipulation that Merchants Bank issued checks to petitioner totaling $ 41,076.50 disposes of this argument. Respondent also determined that petitioner is liable for an addition to tax for negligence or willful disregard pursuant to section 6653(a). It is incumbent upon petitioner to prove that he is not liable for such an addition to tax. Bell v. Commissioner, 85 T.C. 436, 441 (1985). Petitioner contracted individually with Merchants Bank to provide consulting services, and that contract remained in effect throughout the year before the Court. We need not decide whether petitioner's failure to report such income was negligent or willful, as he has not shown that he was neither. While petitioner testified that the consulting fees were reported by Mary Howard on the advice of petitioner's accountant, this testimony does not establish that his accountant was in possession of all relevant facts. See Johnson v. Commissioner, 74 T.C. 89 (1980), affd. 673 F.2d 262 (9th Cir. 1982). *343 We therefore find that an addition to tax pursuant to section 6653(a) is appropriate. Accordingly, Decision will be entered for the respondent. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. This contract did not encompass any claim which Merchants Bank may have had against Teledyne.↩
3. At the end of Mary Howard's fiscal year ending August 31, 1980, petitioner owned .7 percent of Mary Howard's stock and his wife owned the remaining 99.3 percent as disclosed on Mary Howard's tax return for that period.↩
4. Mary Howard also accrued an expense of $ 40,000 for petitioner's salary on its books for its fiscal year ending August 31, 1981. Of the $ 80,000 accrued by Mary Howard for petitioner's salary in these 2 fiscal years, $ 70,000 was cancelled in the fiscal year ending August 31, 1982.↩
5. In Haag v. Commissioner, 88 T.C. 604, 611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); we reaffirmed the two-part test set forth in Johnson v. Commissioner, 78 T.C. 882, 891 (1982), while noting that the Seventh Circuit and Federal Circuit have rejected that test in favor of a more flexible facts and circumstances approach. Haag v. Commissioner, supra↩ at 611 n. 3. Here, as there, the result would be the same under either test.
6. We found as a fact that with respect to most of the payments received from Merchants Bank, petitioner did not endorse the checks over to Mary Howard but rather deposited them in his personal bank account. Thus petitioner's testimony, upon which this finding is based, contradicts the inference to be drawn from the letter of April 21, 1981.↩