THOMAS EVATT AND LESLIE EVATT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Evatt v. Commissioner
Docket No. 1552-90
United States Tax Court
T.C. Memo 1992-368; 1992 Tax Ct. Memo LEXIS 392; 63 T.C.M. (CCH) 3194; June 29, 1992, Filed *392 Decision will be entered under Rule 155. Richard J. Sideman and Wendy Abkin, for petitioners. Christopher J. Faiferlick, for respondent. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)
6653(a)
6661
(1)(A)
(1)(B)
1985
$ 36,480
$ 4,677
[1]
--
--
$ 8,227
1986
1,789
-- --
$ 89
[2]
--
After concessions by petitioners, the issues are: (1) Whether certain real estate commissions paid in 1985 were earned by petitioner individually, or by his wholly owned personal service corporation. We hold that they were earned by petitioner individually and, therefore, constitute gross income to him. (2) Whether petitioners are liable for the additions to tax under section *393 6653(a)(1) and (2) for negligence for 1985. We hold that they are not. (3) Whether petitioners are liable for the addition to tax under section 6661 for a substantial understatement for 1985. We hold that they are. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners are husband and wife and resided in Byron, California, at the time they filed their petition. References to petitioner in the singular are to Thomas Evatt. Petitioner was a real estate salesperson and has been licensed by the State of California as such since 1974. Petitioner holds an undergraduate degree in business administration with a concentration in real estate from San Jose State University. After graduation from college, petitioner became involved in the commercial real estate field, working for several different commercial real estate firms. Petitioner gained a particular expertise in handling the sales of large industrial land developments in the San Francisco Bay area. On December 2, *394 1981, petitioner and Western Properties Brokerage, Inc. (Western), entered into a "broker/sales" agreement. Western was owned and operated by Donald Bruzzone. The agreement designated petitioner as a subcontractor and established a formula for splitting sales commissions earned for land transactions in which petitioner was the salesperson. This agreement governed the parties' relationship and payments to petitioner. The payments made according to the sales commissions splitting formula constituted the only fee and compensation for petitioner's services. The parties reaffirmed petitioner's status as an independent subcontractor in a November 4, 1983, written agreement, noting that, as such, petitioner would not be treated as an employee in determining State and Federal tax consequences. Petitioner worked full time as a real estate salesperson for Western from December 2, 1981, through April 24, 1985. At some time during 1982 and while still employed by Western, petitioner began to represent Kaiser Development Co. (Kaiser, also referred to in some exhibits as Kacor), regarding Kaiser's options to purchase certain parcels of land near Fairfield, California. Also, at some time *395 prior to February 27, 1985, petitioner began to represent Marathon U.S. Realties, Inc. (Marathon), with respect to Marathon's efforts to sell undeveloped land in an industrial park known as Marathon Industrial Commerce Center in Hayward, California. Four land sales transactions arose from these representations, all of which closed in June and July 1985 and produced a total of $ 71,970.63 in real estate commission fees for the salesperson under the commission-sharing arrangement petitioner had with Western. Western was the broker for these four transactions, known by the parties as the Kaiser-Wolfskill sale, Kaiser-Hansen sale, Marathon-Kearny sale, and Marathon-Paragon sale, the commissions for which are at issue here. All of these sales were of unimproved industrial or commercial real estate. Transactions of this type almost always involve contingencies, the satisfaction of which conditions the closing of the transaction. For example, various city and county agency approvals for site plans, road construction, and the like, as well as financing, are usually prerequisites for these types of sales to occur. It is the real estate salesperson's responsibility to work with the buyer *396 and seller, contractors, and local government agencies to solve problems and facilitate the closing. Under the general custom and practice in the San Francisco Bay area with sales of unimproved industrial or commercial real estate, the salesperson is not entitled to any commissions on a given sale unless and until the sale actually closes and title passes. On April 15, 1985, 9 days prior to leaving Western, petitioner formed T. M. Evatt, Inc. (TME), by causing his attorney, David L. Ach (Ach), to file articles of incorporation with the California secretary of state. On June 3, 1985, Ach resigned as the incorporator of TME and appointed petitioners and petitioner's father, Thomas Paul Evatt, a licensed real estate broker, as the initial directors of TME. Also on June 3, 1985, TME held its organizational meeting and adopted bylaws. TME opened a corporate bank account and issued stock on June 21, 1985. On July 12, 1985, TME filed a Statement by Domestic Stock Corporation with the secretary of state. Prior to July 12, 1985, TME opened a corporate office at 45300 Industrial Place, Suite 1, Fremont, California. On December 20, 1985, petitioner executed a Form SS-4, application for *397 employer identification number, on which petitioner stated that TME started business on April 15, 1985. Petitioner was the sole stockholder of TME. On April 24, 1985, prior to the closing of the four real estate transactions described above, petitioner and Western executed a "termination agreement". That agreement, however, recognized several uncompleted and ongoing transactions, including the four transactions described above, for which petitioner was the salesperson and Western was the broker. The agreement set forth terms for the payment to petitioner of his portion of commissions earned on those transactions should they close. The agreement also expressly required petitioner to provide Western and Western's clients with continuing sales services regarding the enumerated ongoing transactions. These enumerated transactions were not completed at the time petitioner left Western. Substantial work remained in order for the sales to culminate, and if the transactions were unable to close, Western had no right to receive a sales commission and, therefore, would not have to pay a portion of such to the salesperson. The April 24, 1985, agreement made no mention of a corporate entity *398 being responsible, via novation or otherwise, for completing the necessary sales work on the four transactions. Nor did the agreement recognize the existence of a corporate entity owned and operated by petitioner or that petitioner intended to, or did, incorporate his sales activity. Around this time period, petitioner was recruited by and established a working relationship with Arthur Rubloff and Co. (Rubloff). TME signed an independent contractor agreement to provide real estate sales services with Rubloff on November 15, 1985. All four of the above-referenced transactions required significant effort on petitioner's part after he terminated with Western. None of the transactions were guaranteed to go to closing. The two purchases by Kaiser (the Kaiser-Wolfskill transaction and the Kaiser-Hansen transaction) were both of land subject to Williamson Act contracts. A Williamson Act contract, which under State law grants agricultural landowners preferential property tax rates in return for restricting the property's use exclusively to agricultural purposes, requires State approval for cancellation of the contracts. Among other tasks, petitioner worked during April and May 1985 *399 to obtain such a cancellation. Petitioner also helped to obtain the necessary zoning changes from the city of Fairfield before Kaiser agreed to exercise its options to purchase the two parcels. The Kaiser-Wolfskill and the Kaiser-Hansen sales closed in late June 1985. Pursuant to its April 24, 1985, agreement with petitioner, Western issued checks to petitioner in the amounts of $ 25,019.79 for the Kaiser-Hansen sale, and $ 21,806.40 for the Kaiser-Wolfskill sale on June 28, 1985, and July 1, 1985, respectively. These amounts represented petitioner's share of the commissions earned on the two transactions. Petitioner deposited these checks into TME's corporate bank account. Similarly, petitioner performed significant services after leaving Western on the Marathon-Kearny and Marathon-Paragon sales. Among other things, petitioner collected and analyzed marketing information and assisted in the preparation of in-depth reports regarding the commercial prospects for both the Marathon-Kearny and Marathon-Paragon properties. The Marathon-Kearny sale closed on or about May 31, 1985, and again, pursuant to its April 24, 1985, agreement with petitioner, Western remitted to petitioner *400 his share of the commissions earned on the transaction in the amount of $ 7,861.30 on June 3, 1985. The Marathon-Paragon sale closed on June 27, 1985, with Western paying petitioner's share of the commission, $ 17,283.14, to him on July 1, 1985. Petitioner deposited these checks into TME's corporate bank account. Petitioner received a Form 1099 for 1985 from Western which included the commissions from these sales. Subsequently, Western issued two "corrected Forms 1099" removing the commissions from petitioner's Form 1099, and included them on a Form 1099 issued to TME. Petitioner's primary reason for incorporating TME was to enable him to create and fund a corporate-sponsored, tax-deferred retirement plan as advised by Ach and petitioner's accountant, Roberta Schmalz (Schmalz). At its August 7, 1985, meeting of the board of directors, TME adopted a defined benefit pension plan. On March 2, 1986, the board of directors and sole shareholder of TME, by unanimous consent, ratified a resolution entitling petitioner to a monthly salary of $ 5,000. Prior to this time, petitioner had received no salary from TME. Also adopted by consent on March 2, 1986, was a corporate-sponsored *401 health and medical plan and a resolution that TME would make a contribution of $ 25,048 to its retirement plan for the taxable year ended March 31, 1986. TME contributed $ 25,048 to its retirement plan for the taxable year ending March 31, 1986. Petitioner's father and one of the directors of TME, Thomas Paul Evatt, applied for and received on May 14, 1985, a branch real estate broker's license for and on behalf of TME. TME applied for a corporate real estate broker's license on August 16, 1985, and received the same on August 30, 1985. Petitioners, who used the cash basis of accounting during the time period at issue, did not report petitioner's share of the commissions generated by the above-described sales in 1985. Rather, TME, which also used the cash basis of accounting during the time period at issue, reported those amounts on its tax return filed for its initial taxable year of July 1, 1985, through March 31, 1986. Petitioners consulted with their tax advisers, Ach and Schmalz, in filing their return. OPINION Respondent asserts that petitioner earned the commissions at issue here in the amount of $ 71,970.63 in his individual capacity and that he should be taxed on that *402 income. Respondent relies on the assignment of income doctrine and section 482. Petitioner claims that petitioner's wholly owned, personal service corporation, TME, earned the commissions and that it, not petitioner individually, is the proper entity taxable on the commission income. For the reasons set forth below, we agree with respondent that the commissions were earned by petitioner individually, and not by his personal service corporation, and that he is properly taxable on such income. The "first principle of income taxation", that income must be taxed to its true earner, was set forth by Justice Holmes in Lucas v. Earl, 281 U.S. 111 (1930), and that rule has become one of the basic tenets upon which our income tax system is built. Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Johnson v. Commissioner, 78 T.C. 882, 890 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984). In Johnson, we held that a National Basketball Association (NBA) player was the actual and taxable earner of the salary paid by his team, pursuant to his contract with the NBA club, rather than his *403 personal service corporation to whom he assigned the right to receive the payments. We also recognized that: the realities of the business world prevent an overly simplistic application of the Lucas v. Earl rule whereby the true earner may be identified by merely pointing to the one actually turning the spade or dribbling the ball. Recognition must be given to corporations as taxable entities which, to a great extent, rely upon the personal services of their employees to produce corporate income. When a corporate employee performs labors which give rise to income, it solves little merely to identify the actual laborer. Thus, a tension has evolved between the basic tenets of Lucas v. Earl and recognition of the nature of the corporate business form. [Johnson v. Commissioner, supra at 890; fn. ref. omitted.] The test the Court adopted there in balancing the countervailing considerations of assignment of income notions and recognition of the corporate form in the case of a personal service corporation was a "more refined inquiry * * * of who controls the earning of the income." Id. at 891; Bagley v. Commissioner, 85 T.C. 663, 675 (1985), *404 affd. 806 F.2d 169 (8th Cir. 1986). The two necessary elements the taxpayer must establish to meet that test are: (1) That the service-performer employee must be an employee of the corporation and that the corporation has the right to direct and control the employee in some meaningful sense; and (2) there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. Johnson v. Commissioner, supra at 891 (citing Pacella v. Commissioner, 78 T.C. 604 (1982), and Keller v. Commissioner, 77 T.C. 1014 (1981), affd. 723 F.2d 58 (10th Cir. 1983)); see also Bagley v. Commissioner, supra at 675. This is a conjunctive test, both elements of which must be satisfied in the personal service corporation setting in order to avoid application of the assignment of income doctrine. Petitioners bear the burden of proof on both elements. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Both parties recognize that with respect to the assignment of income doctrine, *405 Johnson v. Commissioner, supra, and the Court's test established in that case govern this case. Even assuming that TME complied with all requirements to be a valid corporation under California law, that petitioner respected in a timely manner the requisite corporate formalities governing the organization and operation of the corporation, and that TME controlled petitioner's service activities in a meaningful way, petitioners' argument must fail. This is so even though the transactions giving rise to the commission income in question were not closed and completed and that the earnings process was not complete until the sales closed. The critical missing element is a contract or similar agreement between petitioner's personal service corporation, TME, and the entity using the services, Western. Petitioner argues that the second element of the Johnson test is met because there was a contract between TME and Rubloff, a separate third party broker not involved in the transactions giving rise to the commissions at issue here. However, the existence of this relationship and contract is inapposite to the essential inquiry, whether Western, the entity using *406 the services performed by petitioner here at issue, had a contract with or recognized TME as controlling petitioner's performance. The facts are to the contrary: petitioner's April 24, 1985, termination agreement did not sever all legal relations between Western and petitioner, but instead set forth expectations governing petitioner's future performance regarding the ongoing sales in which Western was the broker, as well as express terms about petitioner's share of commissions earned on the transactions. The existence of that agreement belies the very proposition that petitioner propounds. If petitioner desired TME to take control of the transactions and if Western were recognizing TME and TME's control over petitioner's performance, these facts could have been established in that agreement. It would seem to be the perfect time and opportunity -- TME had been formed 9 days before, and the obvious purpose of the termination agreement was to legally govern the final transactions that petitioner was handling as salesperson for Western. The Rubloff agreement demonstrates that petitioner knew how to cause TME to enter into a contract -- the facts indicate that TME did not do so with *407 Western. Moreover, Western did not receive any independent notification of the existence of TME, and Bruzzone, Western's owner, could not recall when he became aware of the corporation's existence. In addition, we note that TME's initial income tax return was filed for the taxable period July 1, 1985, through March 31, 1986. This representation to respondent that TME's initial taxable period began on July 1, 1985, is inconsistent with petitioners' subsequent contention that TME operated and earned the commission income at issue here prior to that date. Petitioner argues that the July 1, 1985, date was inadvertent and should have read April 15, 1985, date was inadvertent and should have read April 15, 1985, the date of incorporation. The April 15 date was used on the SS-4. However, practically nothing of substance happened to TME prior to July 1, 1985, and the use of that date on the first tax return, whether or not inadvertently, tends to confirm and is consistent with the other corporate facts. On this record, we hold that petitioner's depositing of the $ 71,970.63 commission receipts in TME's corporate bank account and TME's reporting of the same as corporate income is an *408 improper assignment of income; the commissions are gross income to petitioners in 1985. Lucas v. Earl, supra; Johnson v. Commissioner, supra.
Based on the holding above, we need not consider respondent's claim that the commission income should be reallocated to petitioner individually under section 482. We also need not address respondent's discussion that TME could not have earned the commission income in question because the California statute governing real estate sales defines the term "real estate salesperson" as a "natural person", which term is defined elsewhere under California law as an entity other than a corporation. We also must decide whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence and section 6661 for a substantial understatement for 1985. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Neelly v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proof. Bixby v. Commissioner, 58 T.C. 757 (1972). *409 While a taxpayer normally cannot avoid the duty to file accurate tax returns by employing an agent, the addition to tax for negligence may be avoided where the taxpayer provides the necessary information and the filing questions raised are difficult or complex. See, e.g., Woodbury v. Commissioner, 49 T.C. 180, 199 (1967); Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. 398 F.2d 832 (6th Cir. 1968). Here, petitioners relied upon the advice of thier counsel and their accountant. We believe the issues raised in this case are complex and are without clear, bright lines easily indicating whether petitioner had satisfactorily transferred his business to the corporate form. Petitioners' counsel, Ach, and accountant, Schmalz, certainly knew or should have known all the facts, as they were initially involved in the creation and startup of TME. On this record, we hold that petitioners were not negligent and are not liable for the addition to tax under section 6653(a)(1) and (2). Section 6661 imposes an addition to tax for a substantial understatement of tax liability. Section 6661(b)(1)(A) defines a substantial understatement *410 as one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Under section 6661(b)(2)(B)(i), however, the amount of the understatement is reduced by that portion of the understatement for which there is substantial authority for the return position taken by the taxpayer. Petitioners claim substantial authority supported their return position for 1985. To constitute substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Schirmer v. Commissioner, 89 T.C. 277, 283 (1987); sec. 1.6661-3(b)(1), Income Tax Regs. The substantial authority standard is less stringent than a "more likely than not" standard, but stricter than a reasonable basis standard. Sec. 1.6661-3(a)(2), Income Tax Regs. Since the weight of authorities for the tax treatment is determined under the same analysis that a court would employ, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), *411 affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6661-3(b)(3), Income Tax Regs.
In this case, we have held that since TME did not have a contract or other agreement with Western, the second element of the test set forth in Johnson v. Commissioner, 78 T.C. 882 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), has not been met. Petitioners fail to cite any authority that is not materially distinguishable in this respect. We hold that petitioners have not shown that they had substantial authority for their 1985 return position and are liable for the addition to tax under section 6661. Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on $ 36,480. ↩
2. 50 percent of the interest due on $ 1,789.↩