T.C. Memo. 2019-35

UNITED STATES TAX COURT

THOMAS J. FRANCEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6560-17L.                    Filed April 10, 2019.

<u>Charles A. James</u> and <u>Michael H. James</u>, for petitioner.

<u>Jessica R. Nolan</u> and <u>Philip Edward Blondin</u>, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Francel's medical practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Francel's wife diverts cash fees from the medical practice that are not reported as income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

[*2] The IRS searches the medical practice--Francel's wife goes to prison for tax evasion--Francel obtains a judgment of separation from his wife--the medical practice obtains a judgment against her for embezzlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Francel's wife is released from prison--she lives in a halfway house for 10 months--she then lives with her mother for about two years--she then moves back in with Francel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Francel seeks innocent-spouse relief from the IRS . . . . . . . . . . . . . . . . . . . . . . . 24

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    Jurisdiction, standard of review, scope of review, and burden of
      proof  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      a.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            i.    Definition of terms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            ii.   Joint liability; relief from joint liability  . . . . . . . . . . . . . . . 29

            iii.  Collection-due-process hearings; subsequent Tax Court
                  proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            iv.   Deficiency procedure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

            v.    Tax Court jurisdiction over innocent-spouse relief  . . . . . . . . 34

      b.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.    Francel not entitled to relief from joint liabilities . . . . . . . . . . . . . . . . . . . 41

      a.    Section 6015(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      b.    Section 6015(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      c.    Section 6015(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**[*3]**      MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The petitioner, Dr. Thomas J. Francel, filed joint

returns with his wife for tax years 2003, 2004, 2005, and 2006.  His wife pleaded

guilty to evading tax for those years and made restitution to the United States.  The

restitution payment was credited by the Internal Revenue Service ("IRS") to

Francel and eliminated Francel's deficiencies in tax for those years except for

$2,285 of the deficiency for the 2006 year.  This $2,285 remains unpaid.  Also

unpaid is over $142,000 of the interest on the deficiencies for all four years.

Francel filed with the IRS a Form 8857, "Request for Innocent Spouse Relief",

seeking to be relieved of the unpaid liabilities for all four years under section

6015.[1]  The IRS mailed Francel a notice that it intended to levy to collect the

unpaid liabilities.  In response to this notice, Francel requested and received a

collection-due-process hearing at the Office of Appeals.  At the hearing he again

contended that he was entitled to innocent-spouse relief from the liabilities.  In its

notice of determination following the hearing, the Office of Appeals denied

Francel's request for innocent-spouse relief.  Francel filed a timely petition for

---

[1]Unless otherwise indicated, references to sections are to Internal Revenue Code of 1986, as amended, at all relevant times.  We refer to the respondent as the IRS.

[*4] review of the notice of determination. He contends that the Office of Appeals erred in concluding that he was not entitled to innocent-spouse relief. We hold that Francel is not entitled to innocent-spouse relief.

Francel resided in Missouri when he filed his petition. Therefore, the venue for any appeal of our decision in this case is the U.S. Court of Appeals for the Eighth Circuit, unless the parties stipulate another circuit. See sec. 7482(b)(1)(F), (2). Under the rule laid down in Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), we abide by that court's precedent.

## FINDINGS OF FACT

### Francel's medical practice

Currently and during tax years 2003-06, Francel is the chief of plastic surgery at Mercy Hospital in St. Louis, Missouri, and also has a plastic-surgery practice that he operates through his wholly-owned S corporation. We refer to Francel's S corporation as the "medical practice". Francel's wife was the business manager of the medical practice during those years at issue. Her then friend Sharon Garlich was the office manager. All three--Francel, Francel's wife, and Garlich--were employees of the medical practice. There were other employees as well, including a receptionist. Francel was the only doctor employed by the medical practice.

**[*5]** Francel's wife diverts cash fees from the medical practice that are not reported as income

A patient could pay the medical practice's fees in three ways: currency, cashier's checks, or credit cards. The medical practice gave a discount to patients who paid by currency or cashier's checks. Those patients who paid by currency or cashier's checks were typically the patients who paid their fees without assistance from health insurance. (Elsewhere, we use the term "cash" to mean both currency and cashier's checks.) All fee payments were initially received by the medical practice's receptionist.

The following types of fee payments were handled in a conventional way: (1) currency payments that were relatively small (approximately $100 or less), (2) payments by cashier's check in amounts of $10,000 or greater, and (3) payments by credit card. These payments were recorded in the medical practice's computerized accounting system, deposited into the medical practice's bank accounts, reported as income on the medical practice's annual income-tax returns, and reported as passthrough income on the Francels' joint income-tax return.

The other types of fee payments were handled unconventionally. These were: (1) currency payments that were relatively large (above approximately

[*6] $100) and (2) payments by a cashier's check in amounts less than $10,000. These payments were given by the receptionist to Garlich, who would then give them directly to Francel's wife. They were not deposited into the medical practice's bank accounts. Garlich would make a handwritten entry in a green ledger showing the patient's name, the amount of the payment, whether the payment was by currency or cashier's check, and the date the payment was received. The green ledger is not in the record. The payments were not recorded in the medical practice's computerized accounting system. Nor were they reported as income for tax purposes.

Garlich supplied information to the medical practice's CPA (certified public accountant) to assist the CPA in preparing the medical practice's annual income-tax returns. But Garlich never showed the CPA the green ledger in which the payments were recorded or told the CPA about the payments. Nor did Garlich tell the CPA that she was giving any cash directly to Francel's wife. The CPA had access to the medical practice's computerized accounting system. (The system was protected by a password; only Garlich and the CPA used the system or had access to it.) Thus, the CPA could review the records in the system. However, the system did not reflect any of the payments that Garlich gave to Francel's wife. As

[*7] a result, none of these payments were reported as income of the medical practice. Nor were the payments reported on the Francels' joint income-tax returns.

We now address what happened to these unreported cash fees after Francel's wife received them. Francel's wife would sometimes tell Garlich how she spent the cash. She spent it on (among other things) landscaping near the pool at the Francels' house, restoring an old car in the Francels' garage, and constructing iron gates in front of the Francels' house. Francel learned later on that his wife was a habitual drug user. She used some of the unreported cash fees to buy drugs. None of those fees were deposited directly into bank accounts held by Francel or jointly with his wife.

Since at least 2003, Garlich had helped Francel's wife divert unreported cash fees from the medical practice. Garlich eventually became concerned that the scheme "was getting very sloppy" and that her involvement could expose her to criminal liability. In 2007 she hired a lawyer, Tim Engelmeyer, who helped her disclose the scheme to the U.S. Attorney's Office and the IRS Criminal Division. The U.S. Attorney's Office and the IRS Criminal Division instructed her to continue to work at the medical practice and not to reveal that she was cooperating

[*8] with them.  They asked her to wear a wire, but she refused to do so.  They immediately opened a criminal investigation of the Francels.

Thus, for a time Garlich was an undercover informant.  This proved to be stressful.  In May 2007 Garlich began exhibiting strange behavior, alarming her coworkers.  Francel became convinced that Garlich was mentally ill.  To deal with Garlich, Francel relied on Hermann Praszkier, the medical practice's outside lawyer.  Praszkier had been working for Francel and the medical practice since 2005.  He had been handling not only legal work but also personnel issues and irate patients.

Praszkier was already concerned about Garlich's handling of insurance billing, and he began to scrutinize Garlich's work more closely.  He directed another employee to begin keeping a record of when Garlich was in the office so he could compare it to Garlich's own record of her hours.  Eventually Praszkier recommended to Francel that Garlich be fired.  Praszkier gave a number of reasons for firing Garlich:  not showing up for work on time, failing to collect money from insurance companies, and mental instability.  Francel first spoke to Garlich's husband, who was his friend.  Francel asked him whether he would get Garlich to seek mental-health treatment, but Garlich's husband did not agree to do so.

**[*9]** Francel then told Praszkier to fire Garlich. Praszkier planned to fire Garlich on September 28, 2007. Circumstances intervened.

The IRS searches the medical practice--Francel's wife goes to prison for tax evasion--Francel obtains a judgment of separation from his wife--the medical practice obtains a judgment against her for embezzlement

On September 27, 2007, IRS special agents showed up at the office with a search warrant and searched the medical practice. Garlich was at work that day, but she had no warning that the search would occur. At the request of the special agents she gave them the green ledger. They removed other records of the medical practice.

Soon after the search warrant was executed, Praszkier began interviewing the employees of the medical practice to determine the reasons for the IRS's investigation. Because Praszkier wanted to interview Garlich, he decided not to fire her as he had originally planned.

On September 28, 2007, the day after the search, Praszkier sent a letter to Garlich stating that she was suspended without pay pending an "investigation of the office files". Garlich never cooperated with Praszkier's internal investigation. Praszkier again resolved to fire her.

On October 10, 2007, Praszkier wrote a letter to Garlich firing her. The letter stated:

[*10] I have concluded that for cause termination is warranted by: paying your self [sic] for days not worked, or paying your self [sic] for hours not worked, untimely coding of bills, untimely coding of patient billing or not even billing some patients or carriers, failing to pay timely office bills, and failing to follow up on unpaid patient bills which total in excess of $100,000.00, not keeping Thomas Francel MD, PC advised or made aware of the status of accounts, payroll, or bills even requiring you to contact him recently only twenty-four hours after they left for vacation that money needed to be wired to the office, and finally constant tardiness.

Praszkier hired a new office manager to replace Garlich and replaced the medical practice's CPA. Francel's wife continued to be employed as the business manager of the medical practice.

After Garlich was fired by the medical practice, she filed an application for unemployment-compensation benefits with Missouri's Division of Employment Security. The medical practice contested her claim for unemployment benefits, and her claim was denied. Garlich appealed the denial. On January 8, 2008, an appeals referee held a hearing on the appeal. At the hearing Garlich was represented by Engelmeyer, the lawyer who represented her in her dealings with the U.S. Attorney's Office and the IRS Criminal Division. Testifying under oath at the hearing, Garlich suggested that she had been unable to pay the medical practice's bills on time in part because cash fees had been diverted from the medical practice:

[*11] Q  As Business Manager of the office do--what were the reasons for the cash flow problems?

A  The cash flow problems were, you know, I mean everyone knows that insurance claims take a long time to get payment from. They're--they're known for stalling, saying they didn't receive it. They wanted additional information and so forth. However we did acquire a lot of cash from patients and I was not given that cash to use for making payments through the business.

Q  Where did the cash go?

A  The cash went to primarily back to Dr. Francel's wife and if she was not there I would give it to Dr. Francel. It was kept in a safe in my office until I could hand it over to them.

Garlich also testified at the hearing that Francel had advised her that the Francels had decided to solve the cashflow problems by halving the amounts of the cash fees that were being diverted:

I, you know, spoke with them [the Francels] numerous times about how, you know, as a business person I can't--I can't do this job unless I have money in the account. Dr. Francel said he would speak with his wife. One of the solutions he came back with was he spoke to her about the cash and he sat at the pool with her last night and they came up with a solution that instead of keeping all of the cash for a while they would just go ahead and put half of it into the business so that it--it showed that there was payments being made and then she would be able to or they would be able to keep just half the cash.

Praszkier, representing the medical practice, asked Garlich how many Forms 8300, Report of Cash Payments Over $10,000 Received in a Trade or Business, she had

**[*12]** filed with the IRS.[2]  Garlich said she did not and that she did not know what a Form 8300 was.  Praszkier asked Garlich if she thought she was terminated because of the execution of the search warrant.  She said she thought so.  Praszkier asked Garlich: "Can you tell me prior to September 27, 2007, did you have any contact with the IRS?"  Garlich answered: "No."  This was false, for Garlich had been acting as an undercover informant for the IRS before the execution of the search warrant on September 27, 2007.  Praszkier asked Garlich if she had hired her own lawyer on the day of the search.  Garlich avoided the question.  In the closing argument at the hearing, Praszkier argued that the cashflow problems of the medical practice were the result of Garlich's failure to properly bill insurance companies for fees.  He asserted that the reason that there was an IRS investigation was that Garlich had failed to file Forms 8300.  As a result of the appeal Garlich was awarded unemployment compensation.

Meanwhile, the U.S. Attorney's Office continued to investigate the Francels.  It interviewed the employees of the medical practice.  During this

---

[2]A Form 8300 must be filed by a business every time it receives currency in an amount over $10,000.  Sec. 6050I; sec. 1.6050I-1(c)(1)(ii), Income Tax Regs.; United States v. Leventhal, 961 F.2d 936, 937 (11th Cir. 1992).  The Form 8300 shows, among other things, the name of the person from whom the currency was received; the amount of currency received; the date and nature of the transaction; and the name, address, and taxpayer identification number of the business that received the currency.  Sec. 6050I(b).

**[\*13]** investigation each employee was represented by a separate lawyer. The name of the original lawyer for Francel's wife is not in the record. That lawyer was eventually replaced with lawyers Richard Greenberg and David Niemeier. Francel and the medical practice were represented by Praszkier and by lawyer Kevin O'Malley.

In February 2011, more than three years after the IRS executed the search warrant, Francel's wife was indicted by the U.S. Attorney's Office. The indictment charged that in violation of section 7201 Francel's wife willfully attempted to evade or defeat federal income tax owed by her and Francel for tax year 2003 by preparing and signing a false and fraudulent individual joint income tax return that stated that the joint income of the couple was $640,700 and that the tax owed was $199,618 even though she knew that the joint income was $896,337 and that the tax due was $289,091. The indictment charged similar behavior with respect to tax years 2004-06 in different amounts. The table below shows the amounts referred to in the indictment for all tax years in the indictment, i.e., 2003-06:

| [*14]<br>Tax<br>year | Income<br>reported | Tax reported | Actual income | Actual tax | Actual income<br>minus income<br>reported | Actual tax<br>minus tax<br>reported |
|---|---|---|---|---|---|---|
| 2003 | $640,700 | $199,618 | $896,337 | $289,091 | $255,637 | $89,473 |
| 2004 | 581,408 | 178,274 | 846,464 | 271,043 | 265,056 | 92,769 |
| 2005 | 700,987 | 220,421 | 900,597 | 290,284 | 199,610 | 69,863 |
| 2006 | 700,882 | 218,930 | 963,793 | 310,949 | 262,911 | 92,019 |

In the table above, the last two columns contain computations we made from the other columns. The last column, the difference between the actual tax and the tax reported, shows the amount of the underpayment of tax alleged by the indictment. The sums of these underpayments for all four years, 2003-06, is $344,124.

Around August 20, 2011, Francel's wife and her two lawyers (Greenberg and Niemeier) met with Francel and Praszkier. At the meeting, Francel's wife stated that she took unreported cash fees from the medical practice and that she would plead guilty to federal tax charges.

On August 30, 2011, Francel's wife entered into a plea agreement with the U.S. Attorney's Office. Pursuant to the plea agreement, Francel's wife agreed to the following:

- she was guilty of violating section 7201;

[*15] ●     for tax years 2003, 2004, 2005, and 2006, she was given or had access to certain cash fees paid by the medical practice's patients;

●     these cash fees were required to be reported on the medical practice's income-tax returns and on the Francels' joint income-tax returns;

●     Francel's wife deliberately closed her eyes to the fact that these cash fees were not reported;

●     the failure to report the cash resulted in underpayments of tax on the Francels' joint income-tax returns; and

●     the amounts of unreported fees and underpayments of taxes were:

| Year | Fees | Tax underpayment |
|------|------|------------------|
| 2003 | $248,191 | $89,473 |
| 2004 | 257,326 | 92,766 |
| 2005 | 193,796 | 69,863 |
| 2006 | 264,156 | 92,019 |
| Total | 963,469 | 344,121 |

In the table above, the amount of the underpayment for 2004 was $92,766. The indictment stated that the actual tax was $271,043 and the tax reported was $178,274, which corresponds to an underpayment of $92,769 for 2004. Thus the amount of the underpayment in the plea agreement was three dollars less than the comparable amount in the indictment.[3]

_____

[3]Other than 2004, the tax underpayment for each year as shown in the plea agreement is identical to the difference between actual tax and the tax reported as shown in the indictment. However, for each year the amount of the unreported fees as shown in the plea agreement deviates from the difference between the

(continued...)

**[\*16]** On August 30, 2011, the U.S. Attorney's Office wrote a letter stating that Francel was no longer a target of the criminal investigation and that the medical practice had never been a target of the investigation. The letter was written to Greenberg and Niemeier, the lawyers for Francel's wife, at the request of Praszkier, who represented Francel and the medical practice.

On October 4, 2011, Garlich filed a claim with the IRS for a whistleblower award for being an informant. In her claim, Garlich stated that she had served as the main witness in the prosecution of Francel's wife, who Garlich said was the "mastermind" of the tax scheme. She did not assert that Francel knew of the tax scheme. The claim is still pending.

In December 2011, Francel's wife was sentenced by the U.S. District Court to a year and a day in prison followed by two years of supervised release. As part of her sentence, she was ordered to pay the IRS restitution of $344,124. The order does not break down the $344,124 by year, but that amount equals the total of the underpayments in the indictment. This amount is $3 more than the $344,121 sum of the amounts of tax she admitted in the plea agreement that she had evaded.

In January 2012, Praszkier fired Francel's wife from the medical practice.

---

[3](...continued)
actual income and income reported as shown in the indictment. We are unaware of the reason for the deviations.

[*17] On January 27, 2012, Francel filed for legal separation from his wife. He was angry because he thought she had embezzled money from the medical practice. Francel was represented by Michael H. James in the legal-separation proceeding, and his wife was represented by Praszkier. Because Praszkier still represented Francel in other matters, it was a conflict of interest for him to also represent Francel's wife. However, Praszkier received informed written consents from Francel and his wife regarding the conflict of interest.

On the same day, January 27, 2012, the medical practice filed a lawsuit against Francel's wife in state court for embezzlement. The complaint alleged that Francel's wife, "in the course of her employment, diverted, acquired converted and/or collected receipts and payments belonging to, remitted to or owed to" the medical practice to her own "personal use." The medical practice was represented by Michael H. James in the lawsuit. Francel's wife was represented by Praszkier. It is not clear from our trial record whether Praszkier received informed written consents from Francel and Francel's wife to undertake this representation.

On January 31, 2012, Francel's wife began serving her sentence at the Federal Medical Center in Lexington, Kentucky.

[*18] In January 2012, Francel's wife paid the IRS the entire restitution amount of $344,124. To make the restitution payment, she took money from a section 401(k) account that she owned.

The IRS asserted and assessed civil-fraud penalties under section 6663 against Francel's wife for the years 2003-06. These penalties remain unpaid. The IRS did not assert or assess civil-fraud penalties under section 6663 against Francel.

The IRS credited the restitution payment to Francel's account, and the following balances remain for the years 2003-06:

| | |
|------|------------|
| 2003 | $27,303.08 |
| 2004 | 51,876.31  |
| 2005 | 31,249.10  |
| 2006 | 33,985.39  |

We explain how these amounts were computed below.

For tax year 2003, the IRS assessed $89,473 of tax against Francel and gave him an $89,473 credit for the restitution payment from his wife. Beginning in March 2015 and continuing every month since then the IRS has levied an amount from the Social Security benefits that Francel's wife has been receiving and applied the levied amounts against the interest on the deficiency for 2003. The

[*19] monthly levy amount collected by the IRS is approximately $1,000. The $27,303.08 unpaid balance for 2003 consists entirely of interest.

For tax year 2004, the IRS assessed $92,766 of tax against Francel and gave him a $92,766 credit for the restitution payment from his wife. The $51,876.31 unpaid balance for 2004 consists entirely of interest.

For tax year 2005, the IRS assessed $69,863 of tax against Francel and gave him a $69,863 credit for the restitution payment from his wife. The $31,249.10 unpaid balance for 2005 consists entirely of interest.

For tax year 2006, the IRS assessed $94,304 of tax against Francel and credited him $92,019 for the restitution payment from his wife. (This assessment took place on September 1, 2014. On October 21, 2013, the IRS had assessed Francel's wife $92,109 for tax year 2006. The record does not reveal why the assessments against Francel and his wife are in different amounts.) The $33,985.39 unpaid balance for tax year 2006 for Francel consists of (a) an unpaid tax of $2,285 (the difference between $94,304 and $92,019) and (b) interest.

In April 2012 Praszkier had a heart attack. He began scaling back his law practice.

On September 12, 2012, the medical practice received a judgment against Francel's wife in its embezzlement lawsuit. The judgment was the result of the

**[*20]** court's granting the medical practice's motion for summary judgment. The motion had been opposed by Praszkier as the lawyer for Francel's wife. The amount of the judgment, $1,588,680.46, was equal to $963,469 plus prejudgment interest of $625,211.46. The medical practice has not collected the judgment.

On November 8, 2012, nearly 10 months after having filed suit for legal separation, Francel received a judgment of separation from his wife. The judgment of separation stated that the division of property between the Francels was set forth in the separation agreement attached to the judgment, that the division of property was fair and equitable, and that the Francels had to comply with the terms of the separation agreement. The separation agreement had been signed by Francel on October 23, 2012, and by his wife on November 6, 2012. According to the separation agreement, the Francels' marital property consisted of the following assets:

- The couple's family house.
- A second house in which Francel's wife's mother lived. (Both the family house and the second house had been held by the Francels as tenancies by the entirety, according to the separation agreement.)
- A Vanguard section 401(k) account in the name of Francel's wife. (It is unclear whether this is the same section 401(k) account from which she paid the restitution.)
- A Morgan Stanley Brokerage account in the name of Francel's wife.
- A Vanguard money market account in the name of the Francels.
- Custodial/dependent accounts.
- Life insurance policies insuring Francel's life.

[*21] ●      A Fidelity IRA in the name of Francel's wife.
●      A Lincoln IRA in the name of Francel.
●      Three Vanguard section 401(k) accounts in the name of Francel.
●      A Janus section 401(k) account in the name of Francel.
●      A Morgan Stanley IRA in the name of Francel.
●      A Morgan Stanley IRA in the name of Francel's wife.
●      A 2004 Volvo XC90.
●      A 1991 Volvo 740.
●      A 1999 Ford Explorer.
●      A 1989 Mercedes Benz 500SL.
●      A 1974 Triumph.  (It is likely this was the car that Francel's wife spent part of the diverted payments on.)
●      Francel's wife's clothing.
●      Francel's clothing, jewelry, and personal effects.
●      All furnishings, fixtures, equipment, jewelry, appliances, furniture, household goods, utensils, and cookware, including the contents of the two houses.

Of the above-listed marital property, the separation agreement awarded Francel's wife only her clothing and the Vanguard section 401(k) account that had been in her name.  The separation agreement awarded to Francel all other marital property and all rights to the medical practice.  Francel's wife did not give up her rights in marital property as shown in the separation agreement in payment of, or settlement of, the judgment granted to the medical practice.  Section 5 of the separation agreement provided that Francel would be solely responsible and liable for any taxes incurred by him and that Francel's wife would be solely responsible and liable for any taxes incurred by her.

**[\*22]** On November 8, 2012, Francel's wife transferred to Francel her claim to the family house and to the second house that her mother lived in.

Francel did not initially visit his wife in prison and did so only after the couple's three adult children convinced him to do so.

<u>Francel's wife is released from prison--she lives in a halfway house for 10 months --she then lives with her mother for about two years--she then moves back in with Francel</u>

In late November 2012, after almost 10 months in prison, Francel's wife was released from prison to a halfway house in downtown St. Louis.

In January 2013, Garlich filed a wrongful-termination lawsuit against three defendants: the medical practice, Francel, and Francel's wife. Our trial record does not reveal who represented Garlich in the lawsuit--but it was probably Engelmeyer. Francel and the medical practice were represented by lawyer Paul Venker in the lawsuit. Venker had begun to replace Praszkier in representing Francel and the medical practice in various matters. Praszkier represented Francel's wife in the wrongful-termination lawsuit. Praszkier obtained written informed consents to allow him to represent her. In her lawsuit, Garlich claimed that she was fired by the medical practice because she had informed the U.S. Attorney's Office that the medical practice and the Francels were committing tax fraud.

[*23] In February 2013, Garlich moved for dismissal of her wrongful-termination lawsuit.

In July 2013, Garlich refiled the wrongful-termination lawsuit. This time she named as defendants only the medical practice and Francel, not Francel's wife. Garlich's legal theories in the refiled lawsuit were the same as in the original lawsuit. Michael H. James represented the medical practice and Francel. The lawsuit is still pending.

In December 2013, Francel's wife was released from the halfway house. Francel had still not forgiven his wife for embezzling from the medical practice; consequently, he did not want to live with her. She moved in with her mother, who lived in the second house owned by Francel. Her mother had been living in this house since 2000.

In July 2014, Praszkier suffered another heart attack and stopped practicing law altogether.

In late 2015, Francel's wife moved back to the family home with Francel. Francel had changed his mind about divorcing his wife because of the welfare of their three adult children, one of whom lives in the family home.

Francel pays the mortgage and utilities. Francel's wife does not pay these bills. Nor does she pay him rent. She occasionally drives a car that is leased to

[*24] the medical practice. The Francels are still married. Since their legal separation in 2012, the Francels have continued to file joint income-tax returns. They filed joint returns for tax years 2012-16. (They had also filed joint returns for tax years 2003-11.) For tax years 2012-16, Francel paid the tax due with the returns.

Francel's wife has resumed work in the medical practice part time. Her work schedule is about five days a month. She is unpaid. She sells skin-care products and administers chemical peels. She is listed under the "About Us" section of the medical practice's website.

Francel seeks innocent-spouse relief from the IRS

On May 18, 2015, Francel filed his request for innocent-spouse relief with the IRS on Form 8857. He sought to be relieved of the unpaid income-tax liabilities for 2003, 2004, 2005, and 2006. His claim was assigned to Appeals Officer Carol Miller.

On September 22, 2015, the IRS mailed Francel a notice that it intended to levy to collect the income-tax liabilities for 2003, 2004, 2005, and 2006. The formal title of the notice was "Letter 1058--Final Notice of Intent to Levy and Notice of Your Right to a Hearing". We refer to it here as the notice of intent to

[*25] levy.  The notice of intent to levy gave Francel the right to request a collection-due-process hearing with the Office of Appeals.  See sec. 6330(a)(3)(B).

On October 2, 2015, Francel requested a collection-due-process hearing on Form 12153, "Request for a Collection Due Process or Equivalent Hearing", stating that he disagreed with the levy because he was entitled to innocent-spouse relief.  Appeals Officer Martin Engelbrecht of the Office of Appeals was assigned to handle Francel's collection-due-process hearing.

Sometime after December 1, 2015, Appeals Officer Engelbrecht decided that he would await the decision of the Appeals officer who had been assigned to evaluate Francel's May 2015 innocent-spouse claim, Carol Miller.

Around November 2016, Appeals Officer Engelbrecht received the "decision made by Appeals Officer Carol Miller."  The decision, a document entitled "Appeals Case Memorandum", discussed whether Francel is entitled to innocent-spouse relief under section 6015(b), (c), or (f) for tax years 2003-06.  It concluded:  "Appeals determination:  I recommend the denial of relief in full."  It stated that "relief is not available under any provisions of IRC 6015."  It was not signed or dated.  After review, Appeals Officer Engelbrecht adopted Appeals Officer Miller's decision in full.

**[*26]** Appeals Officer Engelbrecht had a telephone conference with lawyer Charles A. James, who represented Francel in the collection-due-process hearing. Charles A. James is the brother of Michael H. James, the lawyer who represented Francel in his legal-separation proceeding against his wife. Appeals Officer Engelbrecht confirmed to Charles A. James that the innocent-spouse request "was being denied."

On February 14, 2017, the IRS mailed Francel the notice of determination following the collection-due-process hearing. The notice of determination, which was signed by Appeals Team Manager Paul Mazan, stated that the notice of intent to levy was sustained. Attached to and incorporated in the notice was a document prepared by Appeals Officer Engelbrecht that stated some of the facts we have just related; i.e., that sometime after December 1, 2015, Appeals Officer Engelbrecht decided that he would await the decision of the Appeals officer who had been assigned to evaluate Francel's May 2015 innocent-spouse claim, that around November 2016 Appeals Officer Engelbrecht received the "decision made by Appeals Officer Carol Miller" rejecting Francel's innocent-spouse claim, that Appeals Officer Engelbrecht reviewed Appeals Officer Miller's decision and adopted it in full, and that in November 2016 Appeals Officer Engelbrecht had had a telephone conference with Francel's representative and confirmed that the

[*27] innocent-spouse request "was being denied." The attachment stated that "you requested innocent spouse relief" and "[your] request for relief was considered and denied." The attachment stated that Francel would receive a separate letter entitled "Final Appeals Notice" regarding the denial of his request for innocent-spouse relief. The attachment stated that a "Final Appeals Notice" would explain to Francel how he could file a Tax Court petition regarding the "innocent spouse decision". The "Final Appeals Notice" promised in the attachment to Francel's notice of determination was never sent.

On March 14, 2017, Francel filed his Tax Court petition. In the petition he requested review of the February 14, 2017 notice of determination by the Office of Appeals and averred that the Office of Appeals erred in denying him innocent-spouse relief. Francel's wife intervened in the case shortly after Francel filed his petition. In her capacity as intervenor, Francel's wife supported his request for innocent-spouse relief. She was living with Francel at this time.

At the trial Francel called Praszkier as a witness. Praszkier testified that he had obtained waivers of attorney-client privilege from Francel, Francel's wife, and the medical practice with respect to his testimony. The IRS cross-examined Praszkier. Francel also testified. Francel's wife did not attend the trial despite

[*28] being a party to the case--i.e., the intervenor.  On the day of trial, the Court dismissed her as a party to the case because she had failed to prosecute the case.

OPINION

1.     Jurisdiction, standard of review, scope of review, and burden of proof

In this part of the opinion, we explain that (1) our jurisdiction to review the February 14, 2007 determination of the Office of Appeals regarding innocent-spouse relief rests on sections 6330(d)(1) and 6015(e)(1), (2) the standard of review is de novo, (3) the scope of review is de novo, and (4) Francel has the burden of proof.

     a.     Background

          i.     Definition of terms

Jurisdiction is the power of a court to resolve a case.  Lightfoot v. Cendant Mortg. Corp., 580 U.S. ___, ___, 137 S. Ct. 553, 562 (2017).  Like other federal courts, the Tax Court is a court of limited jurisdiction.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); Naftel v. Commissioner, 85 T.C. 527, 529 (1985).  That means that the Court's power to resolve cases is limited to the power conferred on it by statute.  See Naftel v. Commissioner, 85 T.C. at 529; see also sec. 7442.  The standard of review refers to the degree of deference given to an agency when a court reviews the agency's decision.  See Citizens' Comm. to

**[\*29]** <u>Save Our Canyons v. U.S. Forest Serv.</u>, 297 F.3d 1012, 1021 (10th Cir. 2002). The scope of review refers to the scope of the record on which judicial review should take place. <u>See</u> <u>Robinette v. Commissioner</u>, 439 F.3d 455, 459 (8th Cir. 2006), <u>rev'g</u> 123 T.C. 85 (2004).

### ii. <u>Joint liability; relief from joint liability</u>

A married couple may file a joint income-tax return. Sec. 6013(a). If they do, they are jointly liable for the tax. Sec. 6013(d)(3). This tax can be collected from either spouse. <u>Id.</u>; <u>Kovitch v. Commissioner</u>, 128 T.C. 108, 110 (2007). Tax includes interest for this purpose. Sec. 6601(e)(1). The circumstances under which a taxpayer can be relieved of joint liability are found in section 6015. <u>See</u> sec. 6015(a), (f). Section 6015 provides three potential roads to innocent-spouse relief: subsections (b), (c), and (f).

In order to be entitled to relief under section 6015(b), the spouse who requests relief must satisfy the following five conditions: (1) a joint return has been made for a taxable year; (2) on that return there is an understatement of tax attributable to erroneous items of the nonrequesting spouse; (3) the requesting spouse did not know and had no reason to know of the understatement at the time the return was signed; (4) taking into account all facts and circumstances, it is inequitable to hold the requesting spouse liable for that year's deficiency in tax

**[*30]** attributable to the understatement; and (5) the requesting spouse elected relief under section 6015(b) within two years after the IRS began collection actions against the spouse requesting relief. Sec. 6015(b)(1).

Section 6015(c) permits an individual who filed a joint return to elect to limit his or her liability to the portion of the deficiency that is allocable to him or her under section 6015(d). Sec. 6015(c)(1). Under section 6015(d) a portion of the deficiency is allocable to the electing spouse if the erroneously reported items giving rise to that portion of the deficiency are allocable to the electing spouse. Sec. 6015(d)(1); see also sec. 1.6015-3(d)(2), Income Tax Regs. An item is allocated to the individuals filing the joint return "in the same manner as it would have been allocated if the individuals had filed separate returns for the taxable year." Sec. 6015(d)(3)(A). The election to limit liability under section 6015(c) is effective only if the requesting spouse made a joint return for the taxable year. Sec. 6015(c)(1). To be eligible to make an election under section 6015(c), the requesting spouse must have either (1) been legally separated or divorced from the nonrequesting spouse at the time of the election, sec. 6015(c)(3)(A)(i)(I), or (2) not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date of the election, sec. 6015(c)(3)(A)(i)(II). The request for relief under section 6015(c) must be made

[*31] within two years after the IRS began collection actions against the requesting spouse. Sec. 6015(c)(3)(B). Furthermore, if the IRS demonstrates that the requesting spouse had actual knowledge, at the time of signing the return, of erroneous items that are allocable to the nonrequesting spouse and that give rise to the deficiency (or portion thereof), then the requesting spouse is generally not entitled to relief under section 6015(c) with respect to that deficiency (or portion thereof). Sec. 6015(c)(3)(C). Furthermore, the portion of the deficiency for which a requesting spouse is liable is increased by the value of any "disqualified asset" transferred to the requesting spouse. Sec. 6015(c)(4)(A).

Where relief is not available under section 6015(b) or (c), section 6015(f) grants the IRS the discretion to relieve a requesting spouse of joint liability if, under procedures prescribed by the IRS, and taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse liable for the unpaid tax or deficiency or any portion thereof. Rev. Proc. 2013-34, 2013-43 I.R.B. 397, modifying and superseding Rev. Proc. 2003-61, 2003-2 C.B. 296, prescribes the procedures under which the IRS will consider whether equitable relief is appropriate.

Section 6015(e)(1)(A) provides that, "[i]n addition to any other remedy provided by law," a taxpayer may file a Tax Court petition to determine the

[*32] appropriate relief available to the taxpayer under section 6015. The taxpayer must be either (1) an individual against whom a deficiency has been asserted and who elected to have section 6015(b) or (c) apply or (2) an individual who requested relief under section 6015(f). Sec. 6015(e)(1). Section 6015(e)(1)(A) provides that the petition must be filed (a) within 90 days after the IRS's mailing of a notice of its final determination of relief to the taxpayer or (b) if the IRS has not yet mailed such a notice, at any time after six months have passed since the taxpayer's election for relief was "filed" (in the case of section 6015(b) and (c)) or the request for relief was "made" (in the case of section 6015(f)). In resolving cases brought under section 6015(e)(1), the Tax Court employs a de novo standard of review and a de novo scope of review. Porter v. Commissioner, 132 T.C. 203, 210 (2009).

   iii. <u>Collection-due-process hearings; subsequent Tax Court proceedings</u>

Section 6330(a) provides that the IRS cannot levy to collect tax unless it first issues a notice offering the taxpayer a collection-due-process hearing with its Office of Appeals. Section 6330(c)(2)(A) provides that at the hearing the taxpayer can raise any issue relevant to the unpaid tax or the proposed levy. This includes appropriate spousal defenses such as claims for innocent-spouse relief. Sec.

**[\*33]** 6330(c)(2)(A)(i).  Section 6330(c)(2)(B) provides that the taxpayer may also raise challenges to the existence or amount of the underlying tax liability if the taxpayer has not had a prior opportunity to do so.  The issues raised by the taxpayer must be taken into account by the Office of Appeals when it makes its determination.  Sec. 6330(c)(3).  Section 6330(d)(1) provides that a taxpayer who disagrees with the determination may file a petition with the Tax Court within 30 days of the determination and that the Tax Court will have jurisdiction over the matter.

The standard of review applied by the Tax Court in reviewing collection-due-process determinations depends on the types of issues involved.  Sego v. Commissioner, 114 T.C. 604, 609-610 (2000).  For issues relating to the underlying tax liability, the Tax Court employs a de novo standard of review.  Id. For all other issues, the Tax Court employs an abuse-of-discretion standard of review.  Id.

The scope of review when reviewing collection-due-process determinations is de novo, according to Tax Court precedent.  Robinette v. Commissioner, 123 T.C. at 94-101.  A de novo scope of review means that the Court's review is not confined to evidence in the administrative record.  See Kreit Mech. Assocs., Inc. v. Commissioner, 137 T.C. 123, 130 (2011).  However, the U.S. Court of Appeals for

**[*34]** the Eighth Circuit has held that judicial review of collection-due-process

determinations should be limited to the administrative record--at least for issues

other than the underlying tax liability. Robinette v. Commissioner, 439 F.3d at

459-462 (rejecting the Tax Court's view that "the Tax Court may receive new

evidence in the course of reviewing whether an appeals officer abused his

discretion in denying relief during a collection due process hearing"); see also

Jordan v. Commissioner, 134 T.C. 1, 9 (2010), supplemented by T.C. Memo.

2011-243.

        iv.    Deficiency procedure

Thus far we have described two types of proceedings that can come before

the Tax Court:  innocent-spouse cases under section 6015(e)(1) and collection-

due-process cases under section 6330(d)(1).  A third type of case that can come

before the Tax Court is a so-called deficiency proceeding.  A deficiency is the

amount of unreported tax (with some exceptions).  Sec. 6211(a).  The IRS is

generally prohibited from assessing a deficiency until after it mails a notice of

deficiency to the taxpayer.  Sec. 6213(a).  Under section 6213(a), the mailing of

the notice of deficiency gives the taxpayer the right to file a petition with the Tax

Court.  The Tax Court then has jurisdiction to redetermine the correct amount of

the deficiency.  Sec. 6214(a).

**[*35]**     v.     Tax Court jurisdiction over innocent-spouse relief

There are three jurisdictional bases for the Tax Court to review a taxpayer's entitlement to innocent-spouse relief. See Maier v. Commissioner, 119 T.C. 267, 270-271 (2002), aff'd, 360 F.3d 361 (2d Cir. 2004). First, a spouse can file a petition pursuant to section 6015(e)(1). See Maier v. Commissioner, 119 T.C. at 270-271. Second, the Court can review the claim in the context of a collection-due-process case under section 6330(d)(1). See secs. 6330(c)(2)(A)(i), (d), 6320(c); Maier v. Commissioner, 119 T.C. at 271. Third, the claim can be asserted by a spouse as an affirmative defense in a proceeding to redetermine a deficiency pursuant to section 6213(a). See Maier v. Commissioner, 119 T.C. at 270.

b.     Analysis

Francel argued his entitlement to innocent-spouse relief at the collection-due-process hearing with the Office of Appeals, an argument he was permitted to make at the hearing by section 6330(c)(2)(A). The Office of Appeals considered and denied his claim for innocent-spouse relief in its February 14, 2017 notice of determination. On March 14, 2017, Francel timely filed his petition within 30 days of the notice. See sec. 6330(d)(1). We are authorized by section 6330(d)(1)

[*36] to review the February 14, 2017 notice of determination, including the denial of innocent-spouse relief.

We also have jurisdiction under section 6015(e)(1) to review the denial of innocent-spouse relief by the Office of Appeals as part of its February 14, 2017 determination. In Raymond v. Commissioner, 119 T.C. 191, 193 & n.3, 194 (2002), a taxpayer raised a claim for innocent-spouse relief at a collection-due-process hearing, the claim was denied in the Office of Appeals' post-hearing notice of determination, and 34 days later the taxpayer filed a Tax Court petition. We held in Raymond that although the Court did not have jurisdiction over the denial of innocent-spouse relief under section 6330(d)(1) (because the taxpayer had filed the petition more than 30 days after the notice of determination), jurisdiction was proper under section 6015(e)(1) because the innocent-spouse claim had been raised at the hearing and rejected in the notice of determination. Id. at 193-194. In Kaufman v. Commissioner, T.C. Memo. 2010-89, slip op. at 3-5, a taxpayer raised a claim for innocent-spouse relief at a collection-due-process hearing, the claim was denied in the Office of Appeals' notice of determination, and within 30 days of the notice of determination the taxpayer filed a petition in which she challenged the denial of innocent-spouse relief. The tax at issue had been fully paid. Id., slip op. at 3. A collection-due-process case that involves a

**[\*37]** fully paid tax is moot and must be dismissed. See Greene-Thapedi v. Commissioner, 126 T.C. 1, 7 (2006). We held in Kaufman that because the notice of determination addressed the taxpayer's request for innocent-spouse relief, the notice "was respondent's final determination regarding petitioner's entitlement to innocent spouse relief." T.C. Memo. 2010-89, slip op. at 4 (citing Wright v. Commissioner, 571 F.3d 215, 220 (2d Cir. 2009), vacating and remanding T.C. Memo. 2006-273). Kaufman therefore treated the taxpayer's petition as one filed under section 6015(e)(1). Kaufman v. Commissioner, slip op. at 4-5. Kaufman did not dismiss the case for mootness, id., slip op at 5, as it would have done had jurisdiction been founded on section 6330(d)(1). Here, as in Raymond and Kaufman, Francel raised his claim to innocent-spouse relief at the collection-due-process hearing, the notice of determination discussed his claim to innocent-spouse relief, and his petition assigned error to the notice of determination's rejection of innocent-spouse relief. Francel's petition is (in part) a petition under section 6015(e)(1). Furthermore, as such, it is timely. This requires some explanation.

A petition under section 6015(e)(1) must be filed (a) within 90 days after the IRS's mailing of a notice of its final determination of relief to the taxpayer or (b) if the IRS has not yet mailed such a notice, at any time after six months have

**[\*38]** passed since the taxpayer's election for relief was "filed" (in the case of section 6015(b) and (c)) or request for relief was "made" (in the case of section 6015(f)). Sec. 6015(e)(1)(A). Here, there are two possible views of how to determine the timeliness of Francel's petition, depending on whether one thinks that the IRS mailed Francel a notice of final determination of innocent-spouse relief under section 6015(e)(1). Under each view, Francel's petition is timely.

One possible view is that the IRS never mailed Francel a notice of final determination of innocent-spouse relief. Although the February 14, 2017 notice of determination stated that a "Final Appeals Notice" would later be issued regarding innocent-spouse relief and that this "Final Appeals Notice" would direct him how to file a Tax Court petition regarding innocent-spouse relief, the Office of Appeals never issued such a "Final Appeals Notice". Because the "Final Appeals Notice" was never issued, one could argue that there was never a final determination of innocent-spouse relief. If this argument is correct, then the timeliness of Francel's petition depends on whether it was filed more than six months after he filed his Form 8857. See sec. 6015(e)(1)(A). Francel filed his Form 8857 on May 18, 2015. His petition was filed on March 14, 2017, more than six months after he filed the Form 8857. Under the first view, his petition was timely.

**[*39]** The second possible view is that the February 14, 2017 notice of determination should be considered the final determination of innocent-spouse relief under section 6015(e)(1). This view is arguably supported by section 1.6015-5(c)(1), Income Tax Regs., which provides that with respect to each request for relief there is only one final administrative determination of relief. The February 14, 2017 notice of determination stated that the Office of Appeals denied Francel's claim for innocent-spouse relief. It did not suggest that its conclusions were tentative, preliminary, or subject to further administrative review. Therefore, the February 14, 2017 notice of determination could be viewed as the one administrative determination of relief under section 6015(e)(1). Under this view Francel's petition, which was filed March 14, 2017, is a timely contesting of the final determination for relief under section 6015(e)(1). It was filed within 90 days of the February 14, 2017 notice of determination.

In summary, we have described two alternative views of how the February 14, 2017 notice of determination should be treated under section 6015(e)(1). Either (1) there was no final determination within the meaning of section 6015(e)(1) or (2) the February 14, 2017 notice of determination constituted a final determination under section 6015(e)(1). Under either view, Francel's Tax Court petition met the timing requirements for the filing of a section 6015(e)(1) petition.

[*40] Thus, we conclude that we have jurisdiction to resolve Francel's entitlement to innocent-spouse relief under section 6015(e)(1). As we explain below, this conclusion affects not only jurisdiction, but also the standard and scope of review to be applied by the Court.

The IRS argues that the standard of review to be employed in this case is abuse of discretion. In reviewing aspects of collection-due-process determinations other than the underlying tax liability we employ the abuse-of-discretion standard of review. See Sego v. Commissioner, 114 T.C. at 609-610.

The IRS also argues that the scope of review is limited to the administrative record. The U.S. Court of Appeals for the Eighth Circuit has held that for judicial review of a collection-due-process determination, as to matters other than the underlying tax liability, the scope of review is limited to the administrative record. Robinette v. Commissioner, 439 F.3d at 459-462. The law of the Eighth Circuit is binding in this case.

Viewing this case as a collection-due-process case, the IRS contends that (1) the relevant standard of review should be abuse-of-discretion and (2) the scope of review should be limited to the administrative record.

However, in cases arising under section 6015(e)(1), the Court employs a de novo standard of review and a de novo scope of review. Porter v. Commissioner,

**[*41]** 132 T.C. at 210. This case arises under section 6015(e)(1). Therefore we employ a de novo standard and scope of review. See Santa v. Commissioner, T.C. Memo. 2013-178, at *12.

There is one other procedural matter to address. That is the burden of proof. As the petitioner, Francel bears the burden of proof. See Tax Ct. R. Pract. & Proc. 142(a); see also sec. 6015(c)(2); sec. 1.6015-3(d)(3), Income Tax Regs.

2.      Francel not entitled to relief from joint liabilities

Francel argues that he is entitled to innocent-spouse relief under either section 6015(b), (c), or (f). We hold that he is not entitled to relief under any of these three subsections.

a.      Section 6015(b)

We initially address relief under section 6015(b).

The first requirement for section 6015(b) relief is that joint returns were filed for 2003-06. See sec. 6015(b)(1)(A). It is uncontested that this requirement is met.

The second requirement is that on each joint return there was an understatement of tax attributable to erroneous items of Francel's wife. See sec. 6015(b)(1)(B). The parties disagree on whether this requirement is met. Francel argues that this requirement is met because the unreported cash fees were the

[*42] embezzlement income of his wife and that she failed to include it on their joint return. The IRS disagrees. It contends that the unreported cash fees were the income of the medical practice and were includable in the Francels' gross income as passthrough income.

We need not determine whether the unreported cash fees could be characterized as the embezzlement income of Francel's wife. Even if the unreported cash fees were the embezzlement income of Francel's wife, this does not preclude the fees' also being income to the medical practice. When an employer earns income and an employee embezzles the proceeds of the income, both the employer and the employee face income inclusions. The employer may deduct any loss that it realizes from the embezzlement. Sec. 165(a), (e); sec. 1.165-8(a)(1), (d), Income Tax Regs. This deduction is allowed for the year in which the employer discovers the loss, sec. 165(e), or, if in the year of discovery the employer has a claim for reimbursement that has a reasonable prospect for recovery, the year in which it can be ascertained with reasonable certainty whether the reimbursement will be received, secs. 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs.

The medical practice earned the unreported cash fees because it provided the services that generated the fees and received those fees for those services. See,

**[*43]** e.g., Lucas v. Earl, 281 U.S. 111, 114-115 (1930); Johnson v. Commissioner, 78 T.C. 882, 891 (1982), aff'd, 734 F.2d 20 (9th Cir. 1984). The medical practice received the unreported cash fees: Its receptionist collected the fees from the patients. Thus, even if the fees were misappropriated from the medical practice by Garlich and Francel's wife, the medical practice was required to report the fees as its income. (Francel does not argue that the medical practice is entitled to loss deductions for the years 2003-06, and the record does not establish that the practice is entitled to one.) Although an S corporation, such as the medical practice, is required to file a return reporting its income, sec. 1.6037-1(a), Income Tax Regs., it is not subject to income tax, sec. 1363(a). The income of an S corporation is included in its shareholder's income. Sec. 1366(a), (c). Therefore Francel, the sole shareholder of the medical practice, was required to include the fees in his income. The erroneous items of income on the Francels' joint returns--the service income of the medical practice corresponding to the unreported cash fees that passed through to Francel as the owner of the medical practice--are attributable to Francel. Because the fees were unreported, the fees gave rise to understatements of tax on the couple's joint return. Therefore, the second requirement of section 6015(b) relief is not met.

**[\*44]** The third requirement of section 6015(b) relief is that Francel did not know or have reason to know of the understatements when he signed the joint returns. See sec. 6015(b)(1)(C). Because the requirements of section 6015(b) relief are written in the conjunctive, i.e., they must all be met for relief to be afforded, we need not determine whether Francel knew of, or had reason to know of, the unreported cash fees.

The fourth requirement, that it be inequitable to hold Francel liable for the 2003-06 deficiencies, see sec. 6015(b)(1)(D), is not met. The deficiencies are attributable to the Francels' failure to report the unreported cash fees on their joint returns, which in turn is attributable to the medical practice's failure to report the proceeds on its tax returns. Francel benefited from the unreported cash fees because his wife spent some of the cash on Francel's house and car. See sec. 1.6015-2(d), Income Tax Regs. (providing that a relevant factor in determining whether it is inequitable to hold a spouse liable for deficiencies on a joint return is whether the spouse "significantly benefitted, directly, or indirectly, from the understatement" and defining a "significant benefit" as "any benefit in excess of normal support"). Today Francel still lives in the house that was improved by the unreported cash fees. He still owns the car that was restored with the unreported cash fees. His accumulated wealth is attributable in part to the unreported cash

[*45] fees and to the unpaid tax from the 2003-06 tax years. In our view the equities are against relief.

The fifth requirement for section 6015(b) relief is that Francel elected relief under section 6015(b) within two years after the IRS began collection actions against him. See sec. 6015(b)(1)(E). The IRS does not contest that this requirement is met.

Having failed to meet the second and fourth requirements for section 6015(b) relief, Francel is not entitled to such relief.

b.      Section 6015(c)

We now consider Francel's entitlement to relief under section 6015(c). Several of the requirements for section 6015(c) relief are uncontested. The IRS does not contest that Francel made joint returns during the years at issue, see sec. 6015(c)(1), that he was eligible to make the election under section 6015(c), see sec. 6015(c)(3)(A)(i), and that the election was timely, see sec. 6015(c)(3)(B). Nor does the IRS contend that Francel had actual knowledge of any erroneous items not allocable to him and giving rise to the deficiencies. See sec. 6015(c)(3)(C). Consequently, there are only two issues left unresolved regarding Francel's entitlement to section 6015(c) relief: (1) whether the deficiencies are allocable to Francel and (2) whether any disqualified assets were transferred to

[*46] Francel. As explained below, we hold that the deficiencies are allocable to Francel. On this ground we conclude that Francel is not entitled to limit his liability under section 6015(c). We need not determine whether any disqualified assets were transferred to him.

Section 6015(c)(1) allows a spouse to elect to limit his or her liability for a deficiency to the portion of the deficiency that is allocable to the electing spouse under section 6015(d). Francel seeks to limit his liability for the deficiencies for tax years 2003 through 2006 under section 6015(c)(1). Francel also seeks to be relieved of the interest on the deficiencies. Evaluating his claim to be relieved of the deficiencies is relatively straightforward. He can be relieved of the deficiencies if the deficiencies are not allocable to him under section 6015(d). We discuss the application of section 6015(d) to the deficiencies below. But Francel also seeks to be relieved of the interest on the deficiencies for 2003, 2004, 2005, and 2006. His theory of relief assumes that if a deficiency is not allocable to him, neither is the interest on the deficiency. The IRS does not dispute this assumption. We need not determine whether this assumption is correct, for we do not ordinarily reach issues not disputed by the parties. Therefore we conclude for the purposes of this case that Francel should be relieved of the interest if the deficiencies are not allocable to him.

[*47] Section 6015(d)(1) provides that a portion of the deficiency is allocable to the electing spouse if the erroneously-reported items giving rise to that portion of the deficiency are allocable to the electing spouse. The erroneously-reported items giving rise to the deficiencies are the unreported cash fees that were paid by patients during 2003, 2004, 2005, and 2006.

The unreported cash fees were received by the medical practice in exchange for its services, though the fees were misappropriated from the medical practice by Francel's wife and Garlich shortly after receipt. Francel was the sole shareholder of the medical practice, an S corporation. Therefore, the unreported cash fees, which are includable in the S corporation's income and in Francel's income as a shareholder, are allocable to Francel. The resulting deficiencies are allocable to him.

In conclusion, we hold that Francel is not entitled to relief from joint liability under section 6015(c). This is because the deficiencies for 2003-06 are allocable to him.

c.      Section 6015(f)

We now consider whether Francel is entitled to relief under section 6015(f). Section 6015(f) provides that under procedures prescribed by the IRS, if, taking into account all the facts and circumstances, it is inequitable to hold an individual

**[*48]** liable for any unpaid tax or any deficiency and relief is not available to the individual under subsection (b) or (c), the IRS may relieve the individual of liability. As directed by section 6015(f), the IRS has issued a revenue procedure to guide its employees in determining whether a taxpayer is entitled to such equitable relief from joint and several liability. Rev. Proc. 2013-34, supra. We consult this guidance when reviewing the IRS's denial of relief. Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011); Porter v. Commissioner, 132 T.C. at 210.

Pursuant to Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399, the requesting spouse must meet seven threshold requirements to be considered for relief under section 6015(f). If the seven threshold requirements are met, the IRS considers the facts and circumstances of the case by taking into account seven nonexclusive factors and other circumstances of the case. Id. sec. 4.03(2), 2013-43 I.R.B. at 400. The IRS applied the revenue procedure and concluded that Francel was not entitled to relief under section 6015(f).[4] We sustain that

_____

[4]One of the seven nonexclusive factors to be considered by the IRS in evaluating claims for sec. 6015(f) relief is whether the requesting spouse knew of or had reason to know of the item giving rise to the deficiency. Rev. Proc. 2013-34, sec. 4.03(2)(c)(i)(A), 2013-43 I.R.B. 397, 401, modifying and superseding Rev. Proc. 2003-61, 2003-2 C.B. 296. Appeals Officer Miller concluded that Francel knew of or had reason to know of the unreported income. We need not

(continued...)

**[*49]** determination.  In our view it is not inequitable for Francel to remain liable

for the 2003-06 joint liabilities.  We hold that Francel is not entitled to relief under

section 6015(f).

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.

---

[4](...continued)
determine if Francel knew of or had reason to know of the unreported income.  We
agree with all other aspects of Appeal Officer Miller's decision.  Even if Francel
did not know of, or have reason to know of, the unreported income, in our view it
is not inequitable for Francel to remain liable for the 2003-06 joint liabilities.